## Joshua Hoopes' Estate.  Appeal of Edith Thompson et al.

*Will—Undue influence—Lunacy.*

Testator, who had been declared a lunatic, claimed to be sane, and employed an attorney at law to procure an order superseding lunacy proceedings. Pending the litigation, the attorney, a comparative stranger to the testator, without consultation with or having present any of testator's friends or relatives, privately prepared and had executed by testator two wills, in both of which the attorney was named as one of the legatees and sole executor, and both of which were witnessed by him. When testator stated to the attorney as a reason for making him a legatee that he wished to provide compensation for his contemplated services in the lunacy proceedings, the attorney did not inform the testator that, if successful, his property, ample wherewith to remunerate the attorney, would be restored to him, and if unsuccessful, that a fee would be allowed by the court out of testator's estate. He also neglected to inform testator that the amount of the legacy was out of all proportion to the services he would be called upon to render. *Held*, that the legal presumption of undue influence arising from the condition of the testator and the confidential relations of the parties must be removed by evidence on the part of those asserting the validity of the will.

*Will—Testamentary capacity—Lunacy—Lucid interval.*

When a person is shown to have executed an alleged will after he had

been legally declared a lunatic, the burden of proof is upon the proponents of the will, who must show that it was executed in a lucid interval, and when the testator had understanding and capacity to execute the will.

In a contest over the validity of a will, the testimony showed that the testator was over eighty years of age when the alleged will was executed; that his sister, several of his brothers and an aunt were insane, and that he himself had been found a lunatic five years before he executed the paper in question; that his habits were filthy and he was incapable of taking proper care of his person; that he did not know who were his relatives or next of kin; that he had no clear conception of his property or of its value; that he was under the delusion that his farm contained a large deposit of coal of great value; that he was easily influenced, especially by any one who favored the restoration of his property to his control, and that he believed his committee, who was not his next of kin, and against whom he at times exhibited feelings of hostility would secure a portion of his estate unless he made a will. *Held*, that the evidence was insufficient to justify the court in allowing an issue devisavit vel non.

Argued Feb. 19, 1896.    Appeal, No. 194, Jan. T., 1896, by Edith Thompson, from decree of C. P. Chester Co., refusing to admit an alleged will to probate.    Before STERRETT, C. J., GREEN, DEAN and FELL, JJ.    Affirmed.

Appeal from register of wills.

The facts appear by the opinion of HEMPHILL, J., which was as follows:

Joshua Hoopes died September 14, 1894, and on the same day W. S. Harris, Esq., filed with the register the following notice: "Do not grant letters of administration or testamentary in estate of Joshua Hoopes, deceased, without giving me notice."

On September 17, 1894, A. P. Reid, Esq., as "counsel for heirs interested in the estate of said deceased" filed a caveat. Later a writing bearing date June 28, 1892, purporting to be the last will and testament of the said Joshua Hoopes, deceased, was presented for probate and a hearing thereon fixed for October 9, 1894, when the said W. S. Harris, Esq., in his "own behalf as executor and legatee of the said paper writing dated June 28, 1892, alleged to be the last will and testament of Joshua Hoopes, deceased, and against the probate of which a caveat had been filed" requested of the register "the appointment of an orphans' court for the decision thereof agreeably to the 25th section of the act of assembly approved March 15th, 1832, relating to registers and registers' courts."

In compliance with this request the register on October 19, 1894, did appoint and call an orphans' court and certified the records and proceedings before him, together with a copy of said writing to said court.

Upon the cause coming on for hearing in the orphans' court the proponents presented a prima facie case by proving the execution of the alleged will by the subscribing witnesses, testamentary capacity being presumed until disproved : Grubb v. McDonald, 91 Pa. 236 ; Landis v. Landis, 1 Grant, 248.

In answer to the prima facie case of the proponents the caveators gave in evidence the record of

| COMMONWEALTH ex rel. A. TAYLOR HOOPES vs. JOSHUA HOOPES. | In the Court of Common Pleas of Chester County. No. 85 to April Term, 1887. |

which showed that on April 11, 1887, a petition for an inquest in lunacy was filed in said court, which having been duly appointed made its return on May 2, 1887, finding that Joshua Hoopes is " a lunatic and has been so for the space of six years last past and does not enjoy lucid intervals," and on the same day Thomas W. Pierce, Esq., was appointed his committee ; that on March 17, 1890, the said Joshua Hoopes presented a petition to supersede the lunacy proceeding, which was referred on March 29, 1890, to George M. Rupert, Esq., as auditor, to take testimony and report upon the advisability of granting the prayer of the petition ; that on January 7, 1891, said auditor filed his report recommending that the commission should not be superseded, to which exceptions were filed on the same day, and on April 7, 1891, were dismissed and the report confirmed ; that on August 1, 1892, a rule was granted to show cause why a second petition of the said Joshua for the superseding of said lunacy proceeding should not be filed, which on September 1, 1892, was dismissed.

The contestants thus shifted upon the proponents both the burden of proof and legal presumption, the law presuming one found to be a lunatic without lucid intervals to so continue until the contrary be proved : 1 Williams on Executors, 53 ; 2 Greenleaf on Evidence, § 686 ; Leckey v. Cunningham, 56 Pa. 370.

While the evidence to establish any fact, condition or propo-
sition must be satisfactory and convincing to the tribunal called
upon to determine it, the character of the proof required neces-
sarily varies according to the circumstances surrounding the
case or the questions involved.

Some of the undisputed facts and circumstances in this case
are that Joshua Hoopes was a bachelor over eighty years of age
when the alleged will was executed and had been found a luna-
tic in 1887; that he resided on the farm of his brother who had
died but a short time before, and that the only members of the
household besides himself were George L. Harris, a hired man,
and Jerusha McClaskey, a hired woman; that William S. Har-
ris, Esq., a member of the bar, who drew the will, first met
Joshua about the middle of May, 1892, was subsequently con-
sulted by him about having the lunacy proceedings superseded,
and prepared two petitions for that purpose; that while thus
acting as his counsel and within one month after making
Joshua's acquaintance he wrote for him a will, which was exe-
cuted, in which he was made sole executor, and he, and the
said George L. Harris, and Jerusha McClaskey were legatees,
and the only witnesses to the will; that two weeks later, June 28,
1892, the said Joshua executed the testamentary paper now
offered for probate, which was also prepared by the said Wil-
liam S. Harris and witnessed by him and S. B. Russell, Esq.,
in which he is named as the sole executor, and he and the said
George L. Harris and Jerusha McClaskey are legatees; that
the said William S. Harris retained possession of said paper
from the time of its execution until Joshua's death, and upon
the day of his death he notified the register not to grant letters
upon his estate without notifying him, and in his own behalf as
executor and legatee requested the calling of an orphans' court;
and that in neither of said alleged wills was any part of the
estate bequeathed to any of the heirs at law or next of kin of
the said Joshua.

The age and insanity of Joshua Hoopes and the confidential
relation existing between him and Mr. Harris who prepared,
and is a beneficiary under, the alleged will having been thus
shown, the proponents must establish both testamentary capac-
ity and freedom from undue influence by proofs, clear and of
the most conclusive character, before its probate can be per-

mitted: Yardley v. Cuthbertson, 108 Pa. 395. Have they done so? To discharge the burden which the law imposes, by reason of the confidential relation of the parties, of showing that no undue influence was exerted, they rely solely upon the testimony of William S. Harris, Esq.

Whether the testimony of a party on whom the law casts suspicion of undue influence or constructive fraud is of itself sufficient to overcome the legal presumption; or whether the equitable rule for the reformation of a writing which requires the testimony of at least two witnesses or one witness and corroborative evidence, is applicable, it is not necessary to determine, for the testimony itself is in our judgment insufficient to rebut the legal presumption of undue influence.

Mr. Harris testified that he first met Joshua Hoopes about the middle of May, 1892, after the death of his brother, A. Taylor Hoopes; that he afterwards met him some three or four times, upon the first two or three occasions, in reference to a contemplated contest over Taylor's will, and upon the last in reference to the superseding of the lunacy proceedings, when he engaged to act as his counsel in that matter and prepared a petition for the signatures of his neighbors and friends; that the next time he met him was when he called in response to a message brought by George L. Harris, who told him "that Joshua would like me (him) to write a will, especially if I (he) thought he was capable of making a will;" that no one was present except Joshua and himself when the will was prepared; that Joshua had the names of nearly all the legatees written down on the margin of a newspaper, from which he read them and then said, "Now put yourself in to have an equal share;" that "I (he) hesitated and I (he) said if you are going to leave me anything you ought to have some one else write the will." "No, put yourself in, I don't want anybody else to write this will, put yourself in there;" that after he had completed the writing of the will he read it over to Joshua, then called in George L. Harris and Jerusha McClaskey, who with himself witnessed it at Joshua's request, and that he did in their presence "mention the fact that he left me a legacy and wanted to be sure there was no suspicion;" that the reason Joshua gave for leaving him a legacy was "Now you are trying to get my property back for me, you are doing all you can for me. I am not able to pay

you anything, I can't get hold of any money, so that if you can get any money in this way after I am gone you are perfectly welcome to it and I want you to have it;" that this will was left with Joshua and about two weeks later was brought to him by George L. Harris who told him that Joshua wanted it changed in two particulars; that he wanted another name added and the provision in reference to Ingram taken out; that he then rewrote the will, omitting the bequest to Ingram, leaving a blank for the number of shares into which the estate was to be divided, and leaving blank the conclusion, so that the name of the additional legatee might be inserted; that upon the next day in company with S. B. Russell, Esq., a justice of the peace, he visited Joshua and after introducing the 'squire who met him then for the first time, took Joshua to one side, and told him he had written the will over and that it was the same as the other, excepting he had left out the provision concerning Ingram, which Joshua said was all right, and then asked him who he wanted added, and he said Robert Hoopes, of West Chester; that he then completed the will, inserting the word "Eighteen" into which the estate was to be divided and the name of Robert Hoopes; that he then read the will over to Joshua, first requesting the 'squire to listen, giving to both Joshua and 'squire as his reason that as "he was named in it as legatee he wanted to remove anything like suspicion;" that he then asked Joshua if that was all right, and he replied, "Yes, that is my will, and I will sign it;" that the will was then signed by Joshua and witnessed by himself and 'Squire Russell, the only persons present; that he retained this will until he offered it for probate; and that Joshua upon the same occasion signed and acknowledged before the 'squire his petition to have the lunacy proceedings superseded.

From this it will be seen that Mr. Harris, a comparative stranger to the testator, with full knowledge of his having been found a lunatic, and without consultation with or having present any of his friends or relatives, privately prepared and had executed by him two wills, in both of which he was named as one of the legatees and sole executor, and both of which he witnessed. And, furthermore, when payment for his contemplated services in the lunacy proceedings about to be instituted was given as the reason for making him a legatee, he failed to inform

the testator that, if successful, he would have his property re-
stored to him and ample wherewith to remunerate him, and if
unsuccessful that a fee would be allowed him by the court out
of his estate; nor did he inform him that $2,000, at which he
estimated his legacy, was out of all proportion to the services
he would be called upon to render, and for which Mr. Talbot
for like services had been allowed by the court a fee of $200.

These facts and circumstances if they do not confirm, certainly
do not remove, the legal presumption of undue influence.

Now as to the other branches of the case: have the propo-
nents discharged the onus cast upon them of establishing, by
clear and satisfactory evidence, the testamentary capacity of the
testator?

"The rule of testamentary capacity in Pennsylvania" says
the Supreme Court in Miller et al. v. Oestrich, 157 Pa. 264,
"was carefully and comprehensively expressed in an opinion of
this court delivered by Mr. Justice TRUNKEY in the case of
Wilson v. Mitchell, 101 Pa. 495, in which he said: 'A man of
sound mind and disposing memory is one who has a full and
intelligent knowledge of the act he is engaged in, a full knowl-
edge of the property he possesses, an intelligent perception and
understanding of the disposition he desires to make of it, and of
the persons and objects he desires shall be the recipients of his
bounty. It is not necessary he should collect all these in one
review. If he understands in detail all he is about, and chooses
with understanding and reason between one disposition and
another, it is sufficient for the making of a will. . . . . To sum
up the whole in the most simple and intelligent form—Were
his mind and memory sufficiently sound to enable him to know
and understand the business in which he was engaged at the
time when he executed the will.'"

To comply with the rule thus laid down proponents produced
evidence to prove, first, that the testator always had testamen-
tary capacity, or secondly, that he had at the time of the exe-
cution of the alleged will.

To establish their first proposition a great number of witnesses
were called, the most material being Forrester Hoopes, who was
a week older than Joshua and who had known him all his life,
Robert F. Hoopes, a legatee, who had known him for fifty years,
and Emily Parker, who had lived on an adjoining place and

known him for thirteen years.   The others had known him for
from fifteen to fifty years, but had seen him only at long inter-
vals, and on these occasions for but a short time, for Joshua rarely
visited and had few visitors.   But few of these witnesses ever
had any business transactions with him, and none of them, any
since he was found a lunatic.   An extended and detailed review
of the testimony of these witnesses would be unprofitable in the
light of the lunacy proceedings extending from 1887 to 1892,
and the testimony of the proponents' own witness, Dr. McClurg,
the attending physician, who testified before the auditor in 1890
that the testator had the testamentary capacity, but who now
very candidly admits that he was not probably justified in giving
the strong testimony he then gave; that since seeing more of
him and becoming better acquainted with him he has very little
doubt " but what at times he might understand exactly what he
meant and what he was doing.   At times he was not competent
to make a will or undestand what he was doing, because there
were times when he was insane and did not understand what
he was doing."

The proponents having thus failed to rebut the presumption
of insanity by establishing the general testamentary capacity of
the testator, must prove that the alleged will was executed dur-
ing a lucid interval.

" The presumption of law is " says Mr. Justice ROGERS in'
Harden v. Hays, 9 Pa. 151, " that the testator is sane until the
contrary is shown; but when a general imbecility of mind is
proved, the burden of proof is thrown upon the opposite party,
who must show that it was executed in a lucid interval, and
when the testator had understanding and capacity to execute
the will."   And upon the nature of the proof the law requires,
he adds, " On this point the court (below) charged in effect that
if the evidence established the fact that there was a lucid inter-
val both before and after the day of the date of the will, the
jury was at liberty to say that he was sane at the time the will
was executed in the absence of proof of his situation on that
day, even against the double presumption of the inquisition and
the evidence.   From this principle I take leave to enter my
dissent.   This principle is founded on the notion, contrary to
the current of the decisions, that a lucid interval is presumed
to continue; whereas it is well known that a man insane may

be well to-day, insane to-morrow, better the next day and hope-lessly diseased the third. To allow the jury to make such an inference would be most unsatisfactory, and may lead to great imposition on that unfortunate class of persons who need so much the protection of the courts. Fraud would be the inev-itable result, as the artful and designing would seize the proper time, when the mind was prostrated by disease to obtain from them a disposition of their estate. The very fact that no evi-dence is given bearing on the act of execution is sufficient to expose its dangerous tendency and its certainty to mislead. It certainly imposes no hardship to require that, under such cir-cumstances, evidence of the most unexceptionable kind and char-acter, bearing on the very act of disposition, and confined to the time of execution, should be given. Stringent rules only can protect persons placed in this melancholy condition. It is much better, in this country at least, where the law makes an equal distribution of estates, that a person should die intestate, than to expose them to the risk of imposition and fraud at the instance of persons interested to deceive them."

In the case under consideration, the only persons present at the execution of the will were W. S. Harris, Esq., and S. B. Russell, Esq. 'Squire Russell then met Joshua for the first and only time, and was with him he thinks about half an hour. He testified that after being introduced, shaking hands and passing the compliments of the day, Joshua and Mr. Harris had a private conversation, after which Mr. Harris wrote something additional to the will and then read it over, stating that inas-much as he was one of the legatees he thought best to read it over, so that there would be a fair understanding; that "after the will was read to him (Joshua) he brought his hand down on the table in a rather emphatic manner—a satisfied manner—and says 'Tommy Pierce shall not have anything to do with my property anyhow;'" that he next signed both the will and the petition to set aside the lunacy proceedings, and Mr. Harris then asked him if he acknowledged that to be his will, and he said he did—that that was his last will and testament; that after the execution of the will Mr. Harris asked him what his property was worth, and he said he supposed he was worth $40,000, that was including the Delaware county property, that he supposed was worth $10,000; that neither he nor Mr.

Harris had any general conversation with him, for he volunteered nothing himself, but confined himself to answering Mr. Harris' questions.

William S. Harris testified : " I wrote most of this will in my office with my stub pen, and on the 28th day of June I went out to the house in company with 'Squire Russell, of this place. I took occasion to read the will over to him (Joshua) in the presence of 'Squire Russell, after he had given me other directions concerning the execution of it.   He stated he wanted the name of Robert Hoopes added and all the different parties to be given an equal part; the first will would make seventeen parts, which he divided his estate into, and the second eighteen parts he divided his estate into.   I finished writing the will there in his presence, saw him sign it; he asked me to sign as a witness, which I did, and also 'Squire Russell." . . . " When the second will was executed I took occasion to ask him the same question, what he thought his property was worth, in the presence of 'Squire Russell, and I think George Harris was in, too, after the will was executed; he was not in until it was executed. He said in the presence of the 'squire and George Harris that his real estate was worth $10,000, and he thought he was worth altogether about $40,000.   I explained to him that my legacy with the others was one eighteenth of $40,000, and he said he knew that, that he understood that; I think I said to him ' You knew that means about $2,000 ? '   Yes, he understood what he was doing.   He seemed to be in good health, reasonably good health for an old man."   Upon cross-examination he testified : " Q.  When he told you he was worth $40,000 did you ask him how he made it up?   A. No, I did not undertake to ask him how he made it up at the time the will was executed.   Q. Did you at any time ask him how he made it up?   A. No, I only discussed these various matters with him and left it in that shape.   Q. Did not you think it was a singular matter for a man to say he was worth $40,000 on the basis you have given us now as his property?   Didn't it occur to you that it was ? A. No, not under the circumstances, because he said he had been told by a lawyer he was worth that much."   His testimony as to what took place the day the will was executed was : " We shook hands with Joshua about the first thing when we got into the room.   I took him to one side and said to him that I

had the will partly written and had the old will with me, and asked him who he wanted added; I told him I had written the will over and had left out the provision concerning Ingram. He said that was all right. I told him that it was the same and he said that was right, that he wanted one name added and that was Robert Hoopes, of West Chester. Robert, he said, had been kind in his attentions and called to see him occasionally, which some of his cousins did not do, and he would like to favor him a little, too. I finished the will before it was signed, I asked the 'squire to listen, and I read the will over to Joshua in the presence of the 'squire. The 'squire heard me read the whole will, I gave Joshua and the 'squire my reasons why I was named in it as a legatee, and wanted to remove anything like suspicion. After I read the will over, I asked him if that was all right; he said, ' Yes, that is my will, I will sign it,' and he went and got his own pen and ink, and sat down and signed the will. I asked him in the presence of the 'squire about his property, what he considered himself worth, so that the 'squire might hear that. He said his real estate was worth $10,000 and he considered himself worth about $40,000. George Harris was in that time, he came in immediately after the will was signed. I asked him if he understood he was giving me one eighteenth as well as the others, he said he understood that, that he wanted all to be treated alike."

This certainly is not evidence of the testator's testamentary capacity, " of the most unexceptionable kind and character," such as the law requires.

Of the two present at the execution, one saw Joshua that day for the first and only time, the other had known him but six weeks and had met him some six or seven times; he volunteered no information as to his estate, its disposition or the names of his beneficiaries (excepting that he wished the name of Robert Hoopes added), nor did he join in any conversation with the witnesses, but confined himself to answering the questions asked by Mr. Harris.

Under these circumstances their opinions as to his mental capacity could be of but little value.

Nor does the evidence of the testator's state of mind and bodily health before and after strengthen that relative to its condition at the time of execution.

Dr. McClurg testified.: "His mind was considerably weakened prior to his (Taylor's) death (May 10, '92) a few months, probably six or eight months, and his mind was very much affected a short time prior to his brother Taylor's death. Shortly before Taylor's death, Joshua would go to him and shake him and say, 'Taylor, are you dead? Taylor, are you dead?' and he started once for an undertaker, and when called back and told that Taylor was not dead, replied, 'but he had better be buried or he will spile;' after that both his physical and mental condition improved, and he was in his better fashion, and then sometime later he grew gradually worse until his death." The Dr. adds, "I do not think for the last three or four years that Joshua Hoopes was capable of managing his property."

Jerusha McClaskey, a servant and legatee, who lived with Joshua from April 10, 1887, to July 1, 1892, testified: "In June, 1892, he was in very good condition, as good condition as he was commonly in—he was just about his best—he had had a slight spell of vertigo a few weeks before, but he had recovered over that and he was in very good mental condition at that time." When she first went there in April, 1887, Joshua, who was then managing his own affairs and attending to his property, "was," she says, "just like a bum, ragged and filthy and dirty, and would smell awful, he hadn't a clean thing to put on, and was so filthy and dirty it was not ˙fit to live with him. After I got him cleaned up he improved in both health and mind, but was always in the habit of going to bed with his clothes on,—half the time he would go to bed with his clothes on, he did not always go to bed with his boots on, but sometimes he did, not often. That was something that followed the family, Taylor Hoopes never undressed when I lived there, except when he was sick and I had charge of him, and made him undress. It was a family failing." She also says that he was in the habit of dirtying his bed and clothing. "I have washed his person, his bed and his clothes, the awfulest kind of clothes that ever was washed. I will not accuse him of dirtying his bed so much as his clothes and the floor, he could not control his bowels. That continued from the time I went there until I left, with the exception of the third year, that year he was pretty good from spring until cold weather in the fall. . . . It was generally a constant thing,—you might look for a bad spell

every ten days or two weeks. . . . It would happen while he was out, through the night, in the morning, dinner time and afternoon, and generally Sundays and Christmas day."

George L. Harris, the hired man and a legatee, testified that he lived with Joshua from 1889 until July 1, 1892; that his brother Taylor used to consult with him about his purchases and about the farming. "In the fore part of the spring, 1892, his bowels were badly out of order, but along in April, this happened may be in March, but after that he got right peart, and was helping me saw crosscut timber out in the woods. . . . and before that he helped me mow weeds along through the season several days and in right hot weather, too, . . . . and when the will was signed he was right peart at that time, and in good health.

"Heard Mr. W. S. Harris ask him what he supposed his property was worth. He studied a bit and he said he could not hardly tell, but he thought the property down yonder (the farm) was worth about $10,000. He told me he thought he was worth altogether about $40,000, and the way he reckoned that was from Wesley Talbot. Wesley Talbot told him; he told him at the time they were trying to get his money back for him. Wesley Talbot had searched for the money and he reckoned it up, and he made it $40,000, and that is what he judged from."

This witness was not present at the signing of either of the wills, but came in immediately after the first had been signed, when he says : "You (W. S. Harris) stopped me at the stove, and you says, 'I want you to hear Joshua acknowledge this will,' and he did, and then Joshua says to you 'I will leave you that legacy for your trouble,' they were the words I think if I remember right." After the signing of the second will, and after 'Squire Russell and W. S. Harris had left "he (Joshua) said the same thing on that will, that he had left you (W. S. Harris) the same in that will as he did before, that he had no other way to pay you, that he had no money and he left you the legacy on that account, he also told me he had left John Reyburn a legacy that day, too." Thinks Joshua was competent to make a will on June 28, 1892, never saw any difference in him the whole time he was there except when he was sick. Upon cross-examination he testified: That as far as he had

any knowledge of him he was always competent to manage his own affairs and make a will, but this judgment he based upon his ability to lay out a worm fence.    Joshua told him " he wanted me to tell Harris to come down and write a will for him,—that he did not want Tom Pierce to have any money, and several of his relatives he did not want to have any money. Never spoke to William Burnett about the will.    In addition to his farm he told me his other property consisted of $6,000 in Tom Pierce's hands, and $7,500 John Darlington had that his father left him."

Thomas W. Pierce, Esq., committee, etc., testified : That Joshua's father, Benjamin Hoopes, had the following children : William, Susanna G., Daniel, Brinton, Joshua, John, A. Taylor and Levis, all now dead, none was married and Joshua was the last survivor.    That as trustee of Joshua he held $8,500 as committee, the Delaware county farm valued at $10,000 less mortgage of $1,300, balance $8,700, and the W. A. S. Ingram mortgage of $1,500, and that the trust fund in hands of John H. Darlington was $17,337.

On behalf of the contestants, John H. Darlington, trustee, testified : That he saw Joshua twice in April and once in May, 1892, did not have much to say to him ; he seemed weaker both in mind and body.    Went there in April, 1892, with Mr. Pierce to make arrangements with Jerusha McClaskey for taking care of Joshua.    She said he required a great deal of care and she wanted some extra pay for taking care of him.    Mr. Pierce gave her extra pay for several months back and made a bargain with her for the future.    She said " they (Taylor and Joshua) both are crazy, the one did not know what ailed the other, that Joshua came out once or twice and said Taylor was dead, and he pulled the clothes off Taylor, and Taylor would not pull them on again unless somebody attended to him, that neither one of them knew how to take care of themselves."

C. Wesley Talbot, Esq., testified : That while conducting the proceedings to have Joshua's property restored to him he wrote a will for him—some time in 1891.    George L. Harris and Theodore P. Apple brought him to his (Mr. Talbot's) office and said Joshua had come in to make a will.    When asked what disposition he wanted to make of his property—he said he wanted to leave a legacy to Jerusha McClaskey and one to

George L. Harris—$1,000 to each—and would like to leave some money to West Goshen township to improve the road between West Chester and the general green. Mr. Apple suggested the amount, $3,000. He did not seem to have a very clear knowledge of what he wanted done with the remainder of his estate and Mr. Apple suggested that he make him the residuary legatee to which Joshua assented and made him also executor. This was destroyed shortly after it was made because both Mr. Apple and Mr. Talbot thought Joshua did not have a clear conception with regard to what he was doing as respects the disposition of a portion of his estate at least. Joshua thought his estate worth about $40,000—placed the farm at $10,000. Mr. Talbot thought his estate at that time worth about $25,000.

William Burnett, a first cousin, testified: " Saw Joshua several times in the month of June, 1892. After Taylor's death he had very little to say—when I would go to speak to him he would turn his back around and seem to be thinking of something. About the middle of June he agreed to go and live with me, but when I came for him refused to go—gave no reason; Jerusha McClaskey said to me that she would sooner take care of a dozen sick men than one crazy man; that Joshua was very feeble in both mind and body, and upon the same visit George L. Harris said, ' Mr. Burnett, you know Joshua is not going to be here long with us, he is a very weak and feeble man,' and added, ' that they had a will made for Joshua that knocked the devil out of some of them.' He was a great deal worse than when he used to come to my place; did not think him capable of making a will, and Joshua told me in July, 1892, that he had never made a will and was not going to make any."

Thomas W. Pierce, Esq., committee, etc., testified: That he had known Joshua since 1852. Went to live at his father's (Benjamin Hoopes) in 1854, and it was his home until 1870—excepting from 1864 to 1868 while at college. Benjamin Hoopes had eight children: Of these William was not strong mentally. Susanna was violently crazy at intervals. Daniel had remarkable mental vigor. Brinton was a lunatic. Joshua was found a lunatic. John was a natural idiot. Taylor was not strong mentally and Levis committed suicide. Saw Joshua frequently in 1892. April 3, 1892, went with John H. Darlington to make

arrangements with Jerusha about taking care of Joshua—she was employed by Taylor. She said she had trouble with Joshua, that he was a great deal of trouble; that he was crazy and by reason of that made more trouble—had had great difficulty with him during the winter. "Agreed to compensate her for the period she complained of and made agreement for his future care, which was executed April 17, 1892. On June 17, 1892, when Malin and Ralston Hoopes were present, I said, 'Joshua, I came to give you some spending money, here is $20.00.' He replied, 'Why, I don't want any money—I have no use for it—I don't spend any, I have no occasion for it here,' and then immediately turned around to me and said, 'I want all my property, every penny of it.' Have heard him say if he could get his property into his own hands he would give anybody all of it to get it. He said the reason he would not go to Burnett's was that he was advised he should not go. After Mr. W. S. Harris gave me notice of an application to get his property back, I mentioned it to Joshua, and he said he wanted it back, and that George Harris suggested he could get it back, and had brought a lawyer out there—he did not know his name, and that he had signed some papers to get his money back. I said George Harris told Mr. Burnett that they had a will made for him. He said if any will was made he did not know of it. This was shortly after July 1, 1892. He told me after Taylor's death that he was a very rich man, worth millions, that one acre of his farm was worth more than Taylor's whole estate. From my knowledge of Joshua in June, 1892, he was not competent to make a will. Dr. McClurg said not only to me but to others, 'that it was absurd to say that Joshua had testamentary capacity at the time the will was made.'"

Mary Hoskins, who succeeded Jerusha McClaskey as Joshua's caretaker, testified—That she first saw Joshua on Sunday, July 3, 1892. He was troublesome and a great deal of care, would follow her everywhere just like a child, and want something or want her to do something for him; was very good to the children, and played with them just like a child—was very forgetful and would ask her as high as seven and eight times a day what day of the week it was. He soiled his clothing and would get into bed with his clothes, shoes and hat on—would talk about his farm being so valuable and how much coal it had

on it; he valued it very high. At several different times told her he had no will, never had and could not make one if he wanted'to; that the law would make his will; said George Harris brought a young lawyer out there to sign some papers to get his money back. "I says, 'Maybe they have a will.' He says, 'No I never signed a will, I never made a will.' He could not remember the name of the lawyer."

Mary Babb, daughter of Mary Hoskins, testified: That she first saw Joshua on July 1, 1892—" he was sitting in the kitchen and Mrs. McClaskey said to my sister and myself, 'Don't mind him, he is as crazy as a bedbug.'"

Emma Garrett, sister of Mary Babb, testified to the same declaration of Jerusha McClaskey as her sister.

The testimony in this case covering over five hundred type written pages, from which the above extracts have been made, has not only failed to satisfy us that Joshua Hoopes had testamentary capacity at the time of the execution of the alleged will, but on the contrary has strengthened his want of it.

It shows that the testator was over eighty years of age when the will was executed; that his sister, several of his brothers and an aunt were insane, and that he himself had been found a lunatic in 1887; that he was unable to take care of either his person or estate; that he did not know who were his relatives or next of kin; that he had no clear conception of his property or its value; that he believed his farm contained a large deposit of coal of great value; that he was easily influenced, especially by any one who favored the restoration of his property to his control, and that he believed that Thomas W. Pierce, Esq., his committee, against whom he at times exhibited feelings of hostility, would secure a portion of his estate unless he made a will, although not his next of kin.

Proof of testamentary capacity should be made by "evidence of the most unexceptionable kind and character bearing on every act of disposition and confined to the time of execution," says the court in Harden v. Hayes, supra, decided in 1848—and the same stringent rule is held in England—Sir John Nichols in Dodge v. March, 1 Hag. 612, saying the court "must demand the most decisive proof of the complete absence of influence and excitement at the preparation and making of this asserted will; it must require unimpeachable evidence of unbiased volition and clear capacity."

When it is borne in mind that such was the rule laid down when parties in interest could not testify, surely it should not be relaxed, but rather be more vigorously enforced, since they have become competent witnesses.

Had the testimony of William S. Harris, Esq., the most material witness for the proponents, been even more full, satisfactory and explicit, we might still have had doubts as to its sufficiency without some strong corroborative testimony or circumstances, for he is not only interested, but the law has cast upon him the suspicion of constructive fraud.

The testimony having failed to satisfy us of the testamentary capacity of Joshua Hoopes at the time of the making and execution of the paper writing bearing date June 28, 1892, and purporting to be his last will and testament, we must refuse to allow it to be probated.

*Error assigned*, among others, was decree refusing to admit will to probate.

*W. S. Harris, W. T. Barber* with him, for appellants.—There was no burden upon the scrivener in this case to show that there was no undue influence exerted: Stokes v. Miller, 10 W. N. C. 241 ; Boyd v. Boyd, 66 Pa. 283 ; Marshall's Est., 15 W. N. C. 284 ; Tallman's Est., 148 Pa. 286 ; Snydam's Will, 32 N. Y. 449 ; Steadman v. Steadman, 14 At. 409 ; Forney's Est., 161 Pa. 209 ; 1 Jarman on Wills, 70.

It was absolutely necessary that a prima facie case be made out against the proponents, otherwise the burden did not shift : Chamberlayne's Best on Evidence, 8th ed. 268.

The evidence was sufficient to show testamentary capacity : Shaver v. McCarthy, 110 Pa. 339 ; Bitner v. Bitner, 65 Pa. 347 ; Neil v. Evans, 1 Am. L. J. 522 ; Taylor v. Trich, 165 Pa. 586 ; Pidcock v. Potter, 68 Pa. 342 ; Thompson v. Thompson, 21 Barb. 107 ; Newhouse v. Godwin, 17 Barb. 236 : Trumbull v. Gibbons, 2 N. J. 117 ; 1 Redfield on Wills, 113 ; 1 Wharton & Stiles, 34 ; 11 Am. & Eng. Ency. of Law, 154 ; Smith v. Smith, 48 N. J. Eq. 566.

A lunatic restored to his reason may make a will, though the guardianship under which he was placed as non compos remains : Stone v. Damon, 12 Mass. 488 ; Breed v. Pratt, 18

Pick. 115; 1 Williams on Executors, 39; Leech v. Leech, 21 Pa. 67; Sill v. McKnight, 7 W. & S. 244; 1 Redfield on Wills, p. 134; Thompson v. Kyner, 65 Pa. 368: Gangwere's Est., 14 Pa. 417; Ludwick v. Com., 6 Harris, 175; Com. v. Schneider, 59 Pa. 328.

*J. Frank E. Hause* and *Alfred P. Reid*, for appellees.—The effect of the inquest in lunacy is to shift the burden of proof to the party asserting capacity: Leckey v. Cunningham, 56 Pa. 370; Titlow v. Titlow, 54 Pa. 216; Cuthbertson's App., 97 Pa. 163; Boyd v. Boyd, 66 Pa. 285; Murdy's App., 123 Pa. 464; Hutchinson v. Sandt, 4 Rawle, 234.

A lucid interval may be shown, but the proof of a lucid interval at the time of the transaction in controversy must be clear: Gangwere's Est., 14 Pa. 417.

The presumption of law is that the testator is sane until the contrary is shown, but when a general imbecility of mind is proved, the burden of proof is thrown upon the opposite party: Harden v. Hayes, 9 Pa. 151; Drake's App., 45 Conn. 21; Yardley v. Cuthbertson, 108 Pa. 395.

Partial insanity renders a will null and void if it can be proved or plainly inferred that the will is immediately founded in or upon such partial insanity: Flood on Wills, 389; Drinkhouse's Est., 14 Phila. 291.

When there is nothing before the Supreme Court but a question of fact upon which the orphans' court has passed, and the findings of the court have been based upon sufficient evidence, its decree will be affirmed: Bearmer's App., 126 Pa. 77.

PER CURIAM, March 16, 1896:

After a full examination of the somewhat voluminous record before us, we are convinced that this appeal is destitute of merit. In view of the careful consideration that has been given to the questions involved by the learned court below, and the satisfactory disposition that has been made of them, we deem it unnecessary to do more than affirm the decree on its opinion. There appears to be nothing in either of the twenty-three specifications of error that requires discussion.

The decree of the orphans' court is accordingly affirmed and the appeal is dismissed, with costs to be paid by the appellants.