In Re: Estate of Mary Griffin, Deceased.

Argued April 14, 1933.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld and James, JJ.

*John G. Koedel,* for appellant, cited: Hoopes Est., 174 Pa. 375; Hoffman's Estate, 209 Pa. 357; Yardley v. Cuthbertson, 108 Pa. 395.

*W. Clyde Grubbs,* and with him *Langfitt & Langfitt,* for appellees, cited: Milholland's Estate, 217 Pa. 65; Kustus v. Hager, 269 Pa. 103; Kane's Estate, 206 Pa. 204.

Opinion by Baldrige, J., July 14, 1933:

Mary Griffin, a spinster, aged about 70 years, died on September 24, 1930. Her estate comprised real and personal property of the approximate value of $9,000. She left to survive her four brothers and the two children of a deceased brother. On January 25, 1930, she executed a will, wherein she disposed of all her property to Delia Hurley and Joseph A. Langfitt, Jr., both strangers to the blood, and appointed the latter executor. The will was duly probated and Michael Griffin, a brother, the appellant herein, filed a petition alleging that the testatrix was not of sound mind, and

that the will had been procured by undue influence, and prayed for the granting of an issue devisavit vel non. The learned court below dismissed the petition, and this appeal followed.

In the early part of 1926 the testatrix was stricken with a mental derangement and was taken to the Allegheny General Hospital. The records of that institution show that she was suffering from chronic nephritis, arteriosclerosis and mental deterioration, and was confused at times by illusions and hallucinations. On March 23, 1926, she was transferred to the City Hospital at Mayview and remained there until April 14, 1926, when she was paroled in the custody of the wife of Michael Griffin, but was returned to that hospital on June 1, 1926. On April 10, 1926, in a proceeding instituted in the court of common pleas of Allegheny County by John Griffin, a brother, represented by Joseph A. Langfitt, Jr., Esq., the testatrix was adjudged a weak-minded person, and the Potter Title & Trust Company of Pittsburgh was appointed guardian. On August 1, 1927, she was paroled in the custody of Thomas Griffin, another brother, but was returned to the hospital on September 7, 1927. On April 4, 1929, at the instance of Mr. Langfitt, attorney for the guardian, she was paroled in the custody of Delia Hurley, a client of Mr. Langfitt, who never had any acquaintanceship with the testatrix prior thereto, and she remained at the Hurley home until her death. It thus appears that she had been an inmate of institutions for mental cases for over three years prior to her last parole, with the exception of about eight weeks.

The decedent executed a will on January 19, 1930 (which by mistake bears the date of January 20, 1929), written by Mary Hurley, daughter of Mrs. Hurley, which reads as follows:

"I Mary Griffin residing with Mrs. Delia Hurley

(my Guardine) Do understand fully what I am doing being in good health of body & mind hereby declare all former wills illegal, and that this is my last will & testament  At my death after all expenses have been paid any money that is left I leave to my Guardine Mrs. Delia Hurley. & Mr. Joseph Langfitt.''

At noon the day this will was drawn, the testatrix had a fainting spell.  Prior thereto, under the testimony of Mary Hurley, the testatrix had talked about drawing a will, but little attention was paid to this request ''because we thought it would wear out her mind.''  When Miss Griffin had recovered consciousness, she expressed fear that she would not survive ''one of these spells'' and that she desired to provide for Mrs. Hurley.  The witness then concluded to write a will.  Miss Griffin expressed her desire that Mrs. Hurley was to have her entire estate, and the will was so drawn.  A few moments thereafter she stated she wanted to leave one-half to Mrs. Hurley and one-half to Mr. Langfitt.  His name was then added, which explains the use of a period in the will after the name of Mrs. Delia Hurley.  This sudden change of purpose indicates a wobbly and vacillating mind, which is not without significance under the facts in this case. The will was signed in the presence of Mrs. Hurley, and witnessed by a Mr. Belleno and his wife.  The latter did not testify, owing to illness, but Mr. Belleno stated that Mary Hurley had asked him four or five days prior thereto ''if I would witness Mary Griffin's signing of the will.''  It thus appears that the writing of this will was not done without previous preparation on the part of the Hurleys.  Miss Hurley testified further that Miss Griffin, the night the will was signed, as she was about to retire, said, ''I wish Junior could come and fix it up.''  This was the term she used when referring to Mr. Langfitt, and when speaking to or of Mrs. Hurley she called her ''Mamma,'' although Mrs.

Hurley was fifteen years younger, which would seem to be some indication of childishness. The next day Miss Hurley told Mr. Langfitt that she had drawn a will for Miss Griffin and requested him to call at the house. He, in company with Miss McFarland, Asst. Trust Officer of the Potter Title & Trust Company, went to the Hurley home, and learned of the contents of the will. He then went to the Mercy Hospital and asked Dr. Gillis, a friend of his, to see Miss Griffin. During his absence Miss McFarland drew another will, which named the same beneficiaries, but disposed of all her estate, real and personal, instead of the money only as in the first will, and appointed the Potter Title & Trust Company executor. Dr. Gillis testified that he is an obstetrician and gynecologist, and that he was not acquainted with Miss Griffin, and had not had a great deal of experience with nervous cases, but expressed the opinion that he could tell whether one is suffering from a mental disturbance. Dr. Gillis, having been informed by Mr. Langfitt that Miss Griffin had been adjudged a weakminded person, questioned her about her property, the members of her family, how she wanted to dispose of her estate, etc., and thus satisfied himself as to her mental condition. The will was then signed in the presence of Mr. Langfitt, Mrs. Hurley and Miss McFarland, and witnessed by Dr. Gillis and Miss Hurley. Mr. Langfitt testified that as they were leaving the house, Miss Griffin said, "Now, remember, I want you to take care of everything," which, under his testimony, he interpreted as meaning that she desired him to be her executor, although the will she had just signed provided contrary wise. When he went to his office, he prepared a third will, the one now in question, wherein Delia Hurley and himself were named beneficiaries of the entire estate, and he, instead of the Potter Title & Trust Company, executor. Mr. Langfitt returned to

the Hurley home on January 25, 1930, where he met, by arrangement, Dr. Gillis, and Dr. Llewellyn, clinical doctor and assistant superintendent of the City Hospital, who knew Miss Griffin as an inmate of that institution and was familiar with her case. Dr. Llewellyn testified that the testatrix knew him and that he questioned her about various matters to determine whether she was competent to make a will; that she said she did not care to leave anything to her family because she had given them money for years. He further testified that "she seemed to be fairly clear." He did not express an opinion as to her mental condition, but the court concluded that he considered her capable. Dr. Gillis testified that he examined the testatrix, and concluded that she was capable of executing a will on that day "as far as anybody could tell." Although there was some testimony that the testatrix was interrogated respecting the extent of her estate, etc., it is not very definite or convincing that she had a full knowledge of the property she possessed. This will was then signed by the testatrix, and witnessed by the two doctors, in the presence of Mrs. Hurley, Miss Hurley and Mr. Langfitt.

Dr. Huth, called in behalf of the petitioner, testified that he treated Miss Griffin during August and September, 1927, when she had symptoms as described by the doctors called by respondents; that she was suffering from senile dementia, which is a permanent affliction; that she was never able to recall him on his nine or ten visits. Michael Griffin, who saw his sister at intervals, testified as to her raving and violence at times, which required physical restraint; that when he visited her on December 25, 1929, she did not recognize him and "she was very rough." About a week later when he called she asked him to have her two brothers, who had lived in Greenland and had been dead for the past forty years, visit her. He testified also that on an occasion when he attempted to see his

sister in 1930, Mrs. Hurley ordered him off the premises; that he then complained to Mr. Langfitt of Mrs. Hurley's conduct and inquired if his sister had made a will. Mr. Langfitt told him absolutely not, that she was in no mental condition to do so; "that my sister was a feeble-minded woman, unbalanced mentally." He further testified that he had never made a request to her for money, but that some years ago he had contributed funds to her. Dr. Maddox, called on behalf of the petitioner, began treating Miss Griffin on August 6, 1929. He was unable to give the dates and number of the visits he had made, but the trust officer of the Potter Title & Trust Company produced vouchers showing he had visited her a number of times up to and including November 29, 1929. The doctor's evidence was not very definite as to her mental feebleness, but he expressed the opinion that she was mentally deficient when he attended her.

We, therefore, have a testatrix, advanced in years, who was judicially adjudicated to be weak-minded and confined to institutions for long periods of time, who attempts to dispose of all her estate to two people, one of whom she had known but eight months, and the other, a lawyer, who, under his testimony, had seen her only twice prior to the execution of the will. One of these occasions was for a brief period of five minutes, when she called at his office to arrange to get new teeth, and the other was shortly after she was confined to the institution at Mayview. True, there was an exchange of some letters with Mr. Langfitt, respecting the payment of her bills, obtaining paroles, etc. We learn from Dr. Llewellyn that when the testatrix was in the City Hospital most of her talk centered about money, and that she complained of her relatives trying to get hers, although there are no other witnesses who testified that any of her kin received or solicited money from her. It is a matter of general knowledge, however, that often when there

is a mental deterioration, a feeling of hostility arises and hallucinations are entertained towards those persons who would naturally and normally receive first consideration. The testatrix executed three wills within five days. If she had had a strong and unconstrained mind, such actions might not be important; but, dealing with an enfeebled mind, and in the attending circumstances, they are entitled to some consideration in determining testatrix's testamentary ability. It must be borne in mind that Mr. Langfitt was acting in an unusually confidential relation to the testatrix, as it was through him, representing her guardian, that she received money, and by his efforts that she obtained her freedom. He was evidently convinced himself that she did not have a full understanding of the contents of the second will as he concluded that she desired him to be the executor, and, therefore, wrote the third will and presented it to this mentally weak woman for execution. A will written under the conditions that are here present, especially where all the relatives are excluded, should be strictly scrutinized, and clear proof of capacity and a free exercise of voluntary choice is required. In other words, that the testatrix had a sound mind and disposing memory, which Mr. Justice TRUNKEY, in Wilson v. Mitchell et al., 101 Pa. 495, 502, defines as "one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty."

The learned court below properly held that as there was an adjudication that the testatrix was a weak-minded person, a presumption of incapacity was raised, and the burden was on the proponents to overcome it, under the authority in Hoffman's Est., 209

Pa. 357, 58 A. 665. The lower court was of the opinion, however, that this burden had been fully met by the testimony of physicians, who were the subscribing witnesses, as well as that of other witnesses, who were in a position to judge her mental capacity at the time she executed the will.

We think the evidence of the proponents was sufficient to justify the awarding of an issue. But we are not in accord with the view that it was so convincing as to remove any substantial dispute as to the material questions involved. In Murdy's App., 123 Pa. 464, 473, 16 A. 483, Mr. Justice Paxson said: "The court below found, and we think correctly, that the proponent had not overcome the presumption of undue influence raised by the proceedings in lunacy. It would require very strong evidence to sustain a will under such circumstances as these. The appellant not only occupied a confidential relation to the testatrix but he had power and control over her by virtue of his position as her committee." In Hoopes' Est., 174 Pa. 373, 376, 34 A. 603, where the testator was advanced in years and of unsound mind, and a confidential relation existed between him and the scrivener of the will, who was a beneficiary, the court held that the proponents were required to establish both testamentary capacity and freedom from undue influence "by proofs, clear and of the most conclusive character, before its probate can be permitted." See, also, Yardley v. Cuthbertson, 108 Pa. 395, 1 A. 765. In Phillips' Est., 244 Pa. 35, 41, 90 A. 457, the court said: "An issue devisavit vel non is a matter of right where the existence of a substantial dispute upon a material question of fact is demonstrated to the court by competent evidence which, under the circumstances of the case, measures in probative force up to the requirements of the law; or, in other words,—as the rule has heretofore most often been put,—when upon a

review of all the proofs a verdict against the will could be properly sustained by a trial judge, the controversy must be submitted to a jury, even though the judge should feel that were he sitting as a juror he would not draw the inferences or reach the conclusion contended for by the contestants. But if the testimony is such that the judge would feel constrained to set aside a verdict against the will as contrary to the manifest weight of the evidence, determined according to relevant legal standards, it cannot be said that a substantial dispute has arisen [citing a number of cases].'' In Sharpless' Est., 134 Pa. 250, 261, 19 A. 630, the court said: ''But, looking at the contestant's evidence separately, it seems to make a case for a jury; and, if no counter evidence were adduced, there would probably be no hesitation as to a verdict. So, on the other hand, it is equally clear that the proponent's evidence would not only support, but, uncontradicted, would command a verdict. Does it, however, so completely meet, answer, and overthrow the contestant's case as to leave but a one-sided issue? We cannot say so. Looking at the whole evidence as put before us in print, we do not think we can safely say that the balance is not doubtful.'' See, also, Robinson v. Robinson, 203 Pa. 400, 434, 53 A. 253; Tetlow's Est., 269 Pa. 486, 494, 112 A. 758.

Taking into consideration the peculiar facts in this case, with all the accompanying circumstances, this court is of the opinion that there was a substantial dispute upon material questions, and that the evidence, taken as a whole, would support a verdict for the petitioner, and that, therefore, an appeal should have been allowed and an issue awarded.

Decree is reversed, and record remitted with direction to allow an appeal as prayed for and award an issue.