In Re: Estate of Annie J. Dible, Deceased.

Argued September 25, 1933.

Before KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Frank I. Gosser,* and with him *George W. Richards,* for appellant, cited: Yardley v. Cuthbertson, 108 Pa. 395; Lawrence's Estate, 286 Pa. 58; Ebert v. Ebert, 78 Pa. 326; Hughes v. Freedley, 294 Pa. 391.

*Edward J. Gannon* of *Hazlett, Gannon & Walter,* for appellees.

OPINION BY BALDRIGE, J., February 1, 1934:

This is an appeal by Harry Vance, a first cousin of the decedent, from an order of the court below refusing to grant an issue devisavit vel non to determine the decedent's testamentary capacity and whether undue influence at the time of the execution of the will was exercised by Emerson Hazlett, Esq., her legal adviser, and Louise Sefton, her nurse, both strangers to the blood.

Annie J. Dible died on December 13, 1931. On June 22, 1931, she executed a will, by her mark, prepared by, and in the presence of, Emerson Hazlett, Esq., and witnessed by R. B. Wilson and G. Merle White. She added a codicil on the 5th of August, 1931, signed by her mark, which had been written by, and signed in the presence of, Hazlett, and witnessed by Louise Sefton and her daughter, Lillian Brewer. The decedent bequeathed $1,000 to the Episcopal Church Home in Pittsburgh; $1,000 to the East Ninth Avenue United Presbyterian Church of Tarentum; $200 to Rev. D. I. Rose, pastor of that church; $100 to Clarence Sefton and his wife; $2,500 to Louise Sefton; $2,500 to Emerson Hazlett, Esq.; $600 to Annetta Muder; and $200 to Sally Fleming (which she revoked by the codicil); and directed that the inheritance tax be paid on the above legacies by her estate. She gave her residuary estate to Frank V. Cooper and Mazie A. Clowes, second cousins.

The decedent was a spinster and had been a resident of the borough of Tarentum for more than fifty years. She was below the average person in intelligence, with a very meager education, and was afflicted with defective eyesight and impaired hearing. Since 1921, if not before, she was practically incapable of conducting any business. Her personal affairs were largely under the care of her favorite cousin, Mrs. Cooper, who died May 15, 1931, and, thereafter, her son, Frank V. Cooper, transacted any business requiring attention

until he was superseded by Emerson Hazlett, Esq. When the will was executed, the decedent had an estate of approximately $18,000, inherited in 1921 from her uncle, Robert Miller, but her securities had depreciated so, that at the time of her death the appraisement of her property amounted to but $8,188.36.

Robert B. Elliott, Esq., a member of the Allegheny County Bar, transacted some legal business for Miss Dible upon the death of her uncle, in 1921, until about October 1, 1924. He had difficulty in explaining various matters to her in connection with the estate and testified that ''from my experience with her and my endeavor to explain various matters to her during the time that I represented her, things in my judgment which I thought I explained to her in very simple language, she could not comprehend any of them, and was certainly not of sufficient mentality that she could make a valid will at any time during that period.''

On February 8, 1927, the decedent was stricken with a cerebral hemorrhage, and lay unconscious in her home, unattended, for a period of approximately twenty-four hours, when her condition was discovered by a neighbor. She was immediately removed to the Allegheny Valley Hospital in Tarentum, where she remained as a patient until the 6th of May, 1927. Dr. Weaver, called upon the part of the proponents, testified that this was ''an attack of apoplexy and was a profound shock;'' that her case followed the ordinary course that apoplexy runs and her mental condition was gradually clearing; that he had known her for many years and she had always had a lisp and talked peculiarly prior to that stroke. This physician's attendance continued until Miss Dible left the hospital on May 6, 1927. He expressed the opinion that she had testamentary capacity at the time he knew her, but he would not deny that he had previously stated that she did not have testamentary capacity. Testimony was given by Jane Painter, a daughter of Mrs. Cooper,

that Dr. Weaver had told her that Miss Dible had no education and was not capable of making a will or of transacting business of any sort.

Dr. Arnold, called upon the part of the contestant, testified that he attended Miss Dible in 1914 when she was bitten by a horse; that he had lived in the neighborhood and had seen her practically every day for eight or nine years, until he left Tarentum in 1918; that her hearing was impaired; she was illiterate, reluctant, backward, and lacked in intellect, and not nearly normally developed.

Dr. Duncan, called by the contestant, stated that he attended Miss Dible at various times at the home of Mrs. Adams between August 2, 1927, and December 6, 1929, and that she had a cerebral disturbance during this period, accompanied by an increase of her paralysis. This witness testified that he could not understand any of the patient's conversation, she seldom recognized him, it was impossible for him to get any intelligent answers from her, and during his attendance her condition grew progressively worse. In his opinion, "she was not capable of doing any business in any form; she was absolutely dependable on someone else." On cross-examination, he said that the attack he referred to was very slight, and he thought that she had numerous other minor ones while she was at Mrs. Adams'.

Miss Dible was taken to Mrs. Sefton's home in December, 1929, and from the 13th of February, 1930, until the time of her death, Dr. Booth was her physician. He was called by the proponents and testified that the decedent was able to answer questions, she knew people, and understood that she had an estate and an income from it. But, on cross-examination, he stated that she had a certain mental deterioration; that she was not a normal person; and that her paralysis had extended more or less to both sides of her body. He was asked: "Could you say that she was

not capable of understanding a will that was more than six or seven words?'' After some discussion the doctor finally said: ''I stated that it would have to be a short will.'' He was asked whether the decedent could understand the provisions of the will at the time it was written. His answer was: ''Now, I feel that Annie did understand the major part of it.'' After considerable indecision, he finally said, in answer to whether she had mental capacity: ''I believe she did.'' He testified further that he had advised the relatives of Miss Dible to remove her from the Sefton home, ''partly because I was a friend of theirs, and I thought their interests might be better protected by having her there at their place. That was the prime cause of that ...... I told [Mr. Husted] that her state was such it was possible to unduly influence her.'' Later he was asked again whether or not he had told Mr. Husted that if the will consisted of six or seven words it was possible she could understand it. He answered: ''I told him from her condition it would of needs have to be a more or less simple form of will. Q. Did you tell him that her condition was such that she could be easily influenced? A. I did. Q. Did you tell him that her mind was not clear, due to the fact that she was confined to her room for so long in a helpless condition? A. Yes, sir. That was not the only reason, but I told him that. Q. Did you tell him that the time of the making of this will Annie was in a weakened condition, due to her physical afflictions? A. Not just in those words. Q. Well, but in substance? A. In substance; yes, sir. Q. Did you tell Frank Cooper and Mrs. Jane Painter that they should get Annie away from the Sefton home? A. I did. I told them they did not have to, but it would be better.'' Referring to the length of the will once more, his answer was: ''I told [Husted] this: It would of needs be a simple will, and it is my opinion he said, something, 'A few words ' and I said, 'Yes.' ''

R. B. Wilson, note teller in the First National Bank and Trust Company, Tarentum, who was one of the witnesses to the will, testified that he had known Annie Dible almost all his life, but that he had not seen her for quite a number of years; that Mr. Hazlett asked her whether this was her will and she said that it was; that she knew him and "she seemed to know what she was doing when we were there;" that when they went to the house Mrs. Sefton met them at the door and then went up to get Miss Dible ready; that Miss Dible did not read the paper herself and that he was not in position to say whether she knew of her own knowledge what it contained; that her tongue was thick and her enunciation was not clear.

G. Merle White, assistant trust officer of the First National Bank and Trust Company, the other witness to the will, testified that he was requested by Mr. Hazlett to witness this will and to get some other party; that when they entered the room after Mrs. Sefton told them to go up, Mr. Hazlett told Miss Dible that they had been brought there as witnesses. He was asked whether or not he thought Miss Dible was of sound and disposing mind, and his answer was: "I think she knew perfectly what she was doing." On cross-examination he said that Mrs. Sefton came in to see if she could do anything and there was some conversation between Miss Dible and her but he did not know what it was.

Mr. Hazlett, Mrs. Sefton and a couple of other witnesses were called. Hazlett said that he was called to the Sefton home a few days before the 12th of January, 1931, in connection with the drawing of a former will, which was dated the 12th of January, 1931. He testified further that he had known Annie Dible for approximately thirty years and started to perform legal services for her about 1916; of drawing two wills for her prior to the last one; that he received a telephone message that Miss Dible wanted to see him

and he visited her for the first time in the home of Mrs. Sefton, whom he had not known before; that he learned that Annie wanted to talk to him about her business affairs and about what would happen in the event of the death of Mrs. Cooper, then ill, who had been named a residuary legatee; that she stated she did not want the Cooper children to get her money. She then instructed him in regard to the making of the will. He gave the opinion that she was able to express herself and could mentally grasp financial matters, etc.

Mrs. Fleming, an old friend of the decedent, was called upon the part of the contestant and testified that she was at the Sefton's two days after the will was made and Mrs. Sefton told her then that Miss Dible had made a will and had given her $2,500; that Mr. Hazlett had inquired about her circumstances and she said, "I think Mr. Hazlett did that to help me out." Mrs. Fleming testified further to a conversation she had later with Miss Dible when Miss Dible told her she had made a will. She said: "Emerson asked me if I didn't want to remember Mrs. Sefton in it and she said, 'Well, I don't know, I pay her as I go along.' She said, 'Now, I don't think that is right, do you?' I said, 'I don't know anything about making a will.' Then she said, 'He said, "Couldn't you leave her $500?"' And she said, 'I said, "Well, if you think so."' And he said, 'Couldn't you leave me the same?' And she says, 'What else could I do? I don't think that is right, do you?' I said, 'I am not familiar with the making of a will.' Q. Now, anything else? A. Then she said, 'I left you the same.' I said, 'Me, Annie?' She said, 'Yes.' I said, 'That was lovely.' I said, 'Why did you do that?'" She also told this witness: "I didn't leave Jane Cooper very much, but I left Mrs. Clowes $5,000 and I left Frank Cooper well fixed."

George W. Smith, president of the Tarentum Sav-

ings and Trust Company, was called upon the part of the contestant, and testified that he had known Annie Dible very well for 38 or 40 years; that he saw her frequently up until the time she had a stroke; and that he was sufficiently well acquainted with her and had had enough contact and conversation with her to form an opinion that she was not a woman of normal mental capacity and ability; that she did not have any idea about her securities or their worth; although he had tried to explain them and her income to her she did not comprehend what he told her.

We have not attempted to quote testimony of all the witnesses who were called, but have endeavored, from this long record consisting of 700 pages, to give a picture of this decedent, with her disability, in order to determine whether an issue should have been granted. As a general rule, the burden of proving mental incapacity or undue influence is upon those who allege it. But where the confidential adviser prepares a will and has it signed in his presence by an old, infirm, illiterate woman, and under which he is substantially benefited, to the exclusion of the next of kin, the onus is upon the proponent of the will to disprove undue influence and establish its validity. That principle was recognized in this case, as the proponents stated their willingness to assume the burden of proof. In will contests, each case depends largely upon its own peculiar facts and circumstances as no two cases are alike. But there are general principles to be considered in determining when an issue should be granted. It has long been recognized that where a testator is advanced in years, illiterate, weak in mind, and bodily infirm, and a confidential adviser, and the scrivener of the will, is a beneficiary for a substantial amount, such circumstances warrant the granting of an issue.

In the case of Boyd v. Boyd, 66 Pa. 283, 294, the decedent "was a man upwards of seventy years of age,

—infirm of body, and certainly not of a strong mind, —exceedingly illiterate—able to write his name, perhaps to read, but not much more—during the latter years of his life showing, to say the least, indications of folly or eccentricity.'' The scrivener was not a lawyer, but had been a justice of the peace and was the decedent's adviser in business matters. He and his family were recipients of substantial amounts under the will. Mr. Justice SHARSWOOD said (p. 296) that such facts ''threw upon the plaintiff in the issue the *onus* of showing that the provisions of the will were fully explained to and understood by the testator, and fully assented to by him. This, as we have said, necessarily *made it a question for the jury,* and justified the learned judge in submitting it to them in the manner he did.'' (Italics are ours.) In Yorke's Est., Kingsley's App., 185 Pa. 61, 69, 39 A. 1119, Mr. Justice HANNA wrote a very clear and exhaustive opinion relative to granting issues when the validity of a will is in question, and cited with approval Redfield on Wills, §515, as follows: ''Where the party to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation. Thus, when a will was written by an attorney or solicitor, who is to be benefited by its provisions, it was considered that this circumstance should excite stricter scrutiny and require clearer proof of capacity, and the free exercise of voluntary choice.'' See, also, Cuthbertson's App., 97 Pa. 163; Wilson's App., 99 Pa. 545; Yardley v. Cuthbertson, 108 Pa. 395, 1 A. 765; Armor's Est., 154 Pa. 517, 26 A. 619; Llewellyn's Est., 296 Pa. 74, 145 A. 810; Griffin's Est., 109 Pa. Superior Ct. 594, 167 A. 613. The appellees cite Draper's Est., 215 Pa. 314, 64 A. 520; Snyder's Est., 279 Pa. 63, 123 A. 663; Lawrence's Est., 286 Pa. 58, 132 A. 786; Phillips' Est., 299 Pa. 415, 149 A. 719; Brennan's Est., 312 Pa. 335, 168 A. 25, and a

number of other cases. We will not attempt to analyze them in this opinion, already too long, but a reading of those cases show facts that are dissimilar to those we have been considering, and contain nothing, in our view, in conflict with our conclusion.

We have given careful consideration, also, to the decision expressed by the learned court below, for whom we have great respect, but we are all of the opinion that the facts before us disclose a case requiring the granting of an issue.

Decree is reversed, and it is ordered and decreed that the issue prayed for in the court below be granted, and the record remitted for further proceedings.