## Caldwell *versus* Anderson.

1. Where a testator is shown to be of weak mind, without regard to the cause from which that weakness has arisen, though it be not sufficient in itself to wholly destroy testamentary capacity, and the person by whom, or under whose advice, the will has been written, being a stranger to the testator's blood, receives a legacy or bequest, large as compared to the testator's estate, the burden shifts from the contestants to the proponents of the will, to prove affirmatively both testamentary capacity, and that the testator acted with a full knowledge of the value of his estate.

2. Where, however, a beneficiary who writes the will for the testator, is a near relative, who, had there been no will, would have been entitled to a large portion of the estate under the intestate laws, the presumption which might arise as against a stranger does not arise as to him.

3. The facts of this case held not to bring it within the rule first above stated. *Semble*, that the court below would have been justified in directing a verdict in favor of the validity of the will.

October 5th 1883. Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT and GREEN, JJ. PAXSON and CLARK, JJ., absent.

ERROR to the Court of Common Pleas of *Westmoreland county :* Of October and November Term 1883, No. 31.

Feigned issue, devisavit vel non, directed by the Orphans' Court, to determine the validity of a writing purporting to be the last will and testament of Hettie Furry, deceased, wherein William Anderson and William Nichols, executors under said will, were plaintiffs, and Martha Caldwell, Mary Anderson, Amanda Anderson, Nancy Anderson, John B. Johnston and Martha, his wife, in her right, Harry E. Anderson, Maggie Anderson and John Beatty, contestants, were defendants.

The said issue was awarded upon an appeal from the decision of the Register admitting said will to probate, the grounds of appeal being testamentary incapacity, undue influence, fraud and duress.

[Caldwell *v.* Anderson.]

On the trial, before HUNTER, P. J., the plaintiffs called the two subscribing witnesses to the will, Jacob H. Harr and Mrs. Mary Smith, who testified to the execution of the will by Mrs. Furry, on Sunday evening, March 19th 1882, by making her mark at the place prepared for the same at the foot of the will; " that in reply to a question she stated that was her last will," and the witnesses then signed in attestation ; that Mrs. Furry was ill in bed, propped up by pillows ; but she conversed intelligently, and seemed to realize what she was doing, and, so far as the witnesses could judge, she was of sound and disposing mind.

The plaintiff then called William Nichols who testified as follows :  .  .  .  .  " They sent about three o'clock for me to go over to make her will.  I went over.  I saw her immediately when I went over.  She said she wanted to make her will.  She suggested then about its being done immediately. She started out by naming my mother.  She spoke in regard to getting materials, of a stand being brought up to write on. The stand was in the lower story.  She was in bed on the second floor.  She told me to get the stand from down stairs. She said there would have to be a stand got to write on.  She said who was to write it.  Her brother, William Anderson, was to write it.  I was there when the will was written.  (Will shown to witness.)  William Anderson wrote this.  It was written in the room at the bedside—at the bedside of the lady who made the will.  Himself and I were the only two who were in the room after things were prepared.  Mrs. Baldridge, I think, brought the stand up, and then she left.  Mrs. Furry knew the contents of the will.  She started out, that she wanted to give my mother one thousand dollars.  She directed what was put in the will.  She directed the whole will, just as it was written.  After it was written, and before it was finished, Mr. Anderson got up and read it to her.  Then after it was finished, he read it to her again.  It was read to her twice in my presence.  After it was finished and read to her, she said she wanted witnesses."

The witness then testified to the execution of the will, in the presence of the two subscribing witnesses, Mrs. Baldridge (her niece who was nursing her), Mr. Anderson and himself. He stated, further, that before they began to draw up the will, William Anderson and himself calculated the amount of Mrs. Furry's property, so far as they knew it, and told her they thought it would amount to about $21,000, (which proved to be a full valuation).  He further testified : " She was of sound mind at the time she made that will.  She was a rather aged woman, said to be in her 81st year.  She was a remarkably strong

[Caldwell *v.* Anderson.]

woman, physically and mentally. She was a widow. She had no children living,—no relatives except collaterals, brothers and sisters. Before I went away I went up and bade her good night, and she requested me to come on Monday morning for her goods that were to be taken to our place; she told me where they were and what she wanted removed." Mrs. Furry died March 24th 1882.

Plaintiffs then offered the will in evidence, dated March 19th 1882, proved April 29th 1882. Objected to as insufficiently proved by the subscribing witnesses, and because the plaintiffs have not made a prima facie case.

Objection overruled, and will and probate read to the jury. Exception.

The will was not printed in the paper books, and the following extract from the charge of the court affords the only direct information as to its contents:—

"By the terms of this alleged will it appears that $1,000 were bequeathed to her sister, Mrs. Nichols; $1,000 to her brother, William Anderson; $500 to her nephew, George B. Anderson; $5,00 to her nephew John Beatty; $1,000 each to William and Robert Nichols; $500 to her niece, Mrs. Baldridge; $200 to her niece, Martha Johnson, and $400 to her sister, Mrs. Caldwell."

The defendants produced several witnesses who testified, in substance, that about four weeks before, Mrs. Furry's death, her brother, William Anderson, arranged with her that she should leave the farm on which she had been living alone, and should go to live with her sister, Mrs. Nichols, who lived on a farm about three miles distant; that her farm should be rented and her personal property be sold at auction on Wednesday, March 15th 1882, which was done; that Mrs. Furry was very unhappy about making the change, and upon the day of the sale was unwell, suffering from a bad cold, excited, sad and in tears; that she continued to grow worse each succeeding day, and on Saturday, a doctor was called in. That on Sunday morning she was worse and did not recognize persons, and could not carry on audible and connected conversation; for these reasons the witness, Miss Annie Johnston, was of the opinion that she was not in her right mind on that day, Sunday March 19th, on which day the will was written; that on the next day, Monday, she did not recognize the witness Mrs. Martha Johnston and others; on Thursday she was flighty and wandered in her talk, and on Friday she died.

Miss Mary Anderson, a niece of Mrs. Furry, testified in chief, inter alia, as follows:—

"From my knowledge of her condition immediately before and after this will was made, and from the facts that I have

[Caldwell *v.* Anderson.]

testified to, she was not of sound mind at the time the will was made. She was not before the sale. She was in such great trouble that she did not know what she was doing. It was against her will to leave there; she never wanted to leave; she never would have, if she had not been forced to leave. She had not been well all winter."

On cross-examination she said:—

"I do not say that my aunt was insane. I did not say so. She was not of sound mind at the time this sale was going on. She was troubled. I do not know whether I said she was not on the day of the sale. I said after they were going to make a sale. It was before the sale that she was not of sound mind. It was the day after uncle William was there and told her she would have to have a sale. I did not think she was of sound mind that day. On Saturday, when I went back, she did not know me. That indicated that she was not of sound mind. The will was made on Sabbath evening following; I was not in the room more than half an hour or so that day. I remained in the room five minutes. I did not have any conversation with her. I did not see her do anything. She was dozing that afternoon. . . . I do not say she was insane; I guess insanity indicates or means when they are crazy. This lady was not crazy, but she was not in her sound mind all the time. I said she was flighty, I did not say she was insane. She was a woman of sound mind, of course, before this trouble was. I said on the stand in the first place she was very flighty; that is what I mean by saying, she was not right in her mind; I do not mean that she was of unsound mind, of course, but she was flighty and her mind was bad after this trouble. She was not of sound mind, of course, when she was flighty. She was until this trouble commenced. She was a woman of sound mind before this trouble, but her mind was impaired during this sickness."

The defendants presented the following points:

"1. Where an alleged testator is old, infirm and illiterate, and a person in whom said testator has had confidence, either on account of close relationship or former business connections, draws a will and makes himself the chief beneficiary therein; and where, in an issue raised to try the validity of such will, there is an allegation of testamentary incapacity, undue influence, etc., it is always incumbent on such beneficiary to prove affirmatively, in order to make out a prima facie case, all the circumstances connected with the drawing of the will, to wit: that the testator was of sound, disposing mind; that no fraud, deception, or undue influence was used in procuring the will, and that testator was laboring under no mistaken apprehensions

[Caldwell *v.* Anderson.]

as to the value of his property, and the amount he was giving to his confidential adviser.

" 2. Applying that doctrine to this case, we instruct you, that the plaintiffs, the executors, were bound to prove, affirmatively, in order to make out a prima facie case, that Hettie Furry, on the Sunday in question, was of sound mind and fit to make a will ; that no undue influence or fraud was practiced on her in making this will, and that she was made fully aware of the value of her estate, and the amount she was devising to plaintiffs. If they have failed to prove any or all of these things they have failed to make out their case, and you must find for defendants.

" 3. According to the doctrine of the law, as enunciated in the first point, we instruct you that the plaintiffs were bound to prove affirmatively (and the burden of proof in this case is upon them) that Mrs. Furry, on the day the will was made, was of sound mind and competent to make a will; that no fraud or undue influence was used in procuring the alleged will to be made, and that she was conscious of the value of her property and the amount she was giving, in the residuary clause to William Anderson and William Nichols. If they have failed to do this, or if the weight of the evidence is against them in this regard you must find for defendant.

" 4. In this case the burden of proof is distinctly on the plaintiffs, and does not shift. They must rely on the strength of their own proof ; and if they have failed to satisfy you, in any particular, that this was a good will, it must fall, and you must find for the defendants.

" 5. The above instruction applies with the same force to William Nichols as to William Anderson ; because the former, although not the actual scrivener, was present at the making of the will, assisted in its execution, and is also a large recipient of the bounty of testatrix.

Answers. " 1. This point, as a general proposition, is affirmed.

" 1, 2, 3, 4 and 5. As to these points, we have only to say, that when the will of Hettie Furry, was attacked or impeached on the ground set forth in the appeal, affirmative proof will be required of plaintiffs before they could ask you, by your verdict, to sustain the will. They have given you affirmative proof during the progress of the trial; the sufficiency of the evidence to establish the facts is largely, if not altogether, for the jury. We may add that the beneficiaries under the will are not strangers, but of the blood of the deceased, and nearly allied by the ties of consanguinity ; and this appears upon the face of the alleged will itself, which fact is proper for your consideration."

[Caldwell *v.* Anderson.]

. Verdict and judgment for the plaintiffs. The defendant took this writ of error, assigning for error, inter alia, the answers to defendants' points, as above.

*Moorhead* and *Head*, (*J. J. Johnston* with them), for the plaintiffs in error.— We contend that the error which pervaded the trial was, that the court refused to recognize that the facts of this case brought it within the rule of Boyd *v.* Boyd, and subsequent cases. Although it had been established by the examination of the witnesses to the execution of the will, that the testatrix was eighty years of age, infirm of body and of mind, illiterate, and at the time this alleged will was made was suffering intensely in the grasp of a malady which culminated in her death within a few days ; that the scrivener, first, and he who was present at the preparation of the instrument, next, were the chief beneficiaries under it; yet, instead of requiring the affirmative proof necessary to make out the case demanded by law, it was held that a prima facie case was established by the simple production of the paper and testimony of the subscribing witnesses.

*A. M. Brown* and *H. P. Laird* (*W. H. Klingensmith* with them), for the defendants in error.

Mr. Justice GORDON delivered the opinion of the court, January 7th 1884.

The counsel for the plaintiffs in error make a mistake when they attempt to adapt the facts of the case in hand to the legal principles announced in Boyd *v.* Boyd, 16 P. F. S. 283, and Cuthbertson's Appeal, 1 Out. 163. The first, second, third and fourth points of the contestants, are little more than a re-statement of the doctrine of these cases, and counsel thinking they have presented a similar array of facts find fault with the court below for not affirming distinctly and without qualification those points.

The law as contained in those cases may be summarized as follows : Where the testator is shown to be of weak mind, without regard to the cause or causes from which that weakness has arisen, though it be not sufficient in itself to wholly destroy testamentary capacity, and the person by whom, or under whose advice, the will has been written, being a stranger to the testator's blood, receives a legacy or bequest, large as compared to the testator's estate, the burden of proof shifts from the contestants to the proponent of the will. In such case not only must testamentary capacity be affirmatively proved, but it must also be shown that the testator acted with a full knowledge of the value of his estate.

According to this rule, it lay with the contestants, in the first place, to prove that in the testatrix there was some mental weakness, in consequence of which she was in a condition to be imposed upon.   For that, a person of thoroughly sound mind, whether old or young, may dispose of his property as he pleases, and call upon whom he will to act as his scribe and counsellor, cannot be doubted.   But an examination of the evidence, produced on part of the contestants, does not satisfy us that they have made out such a case as is necessary to shift the burthen of proof.   It is true that some of their witnesses insist that Mrs. Furry was not of sound mind, but when we come to analyze their testimony we find that they have substituted the trouble and anxiety resulting from the necessity she was under of selling her personal property and breaking up housekeeping for imbecility of mind.  For instance, Miss Annie Johnston says she had not been in her right mind for a week before the sale. But clearly, this was a mistake, for from all the evidence, a week before the sale, she was not only mentally but bodily sound ; it is therefore, obvious, that here mental anxiety is put for mental unsoundness.   So, also, Miss Mary Anderson testifies that she was not of sound mind, not only on, but before, the day of sale, "she was troubled."   Again, "this lady was not crazy, but she was not in her sound mind all the time.   She was flighty ; I did not say she was insane.   She was a woman of sound mind, of course, before this trouble was ;" and so on.

On the other hand, Miss Kate Wyland, who was with Mrs. Furry on the Thursday and Friday preceding the Sunday on which the will was executed, observed nothing of either flightiness or mental weakness, but says she seemed to be just as she always was, only greatly troubled.   Then, when we come to the testimony of John Beatty, one of the contestants, whatever suspicion the preceding evidence might have raised of the testatrix's intellectual debility, is at once swept away. This man was her nephew, one of the executors of her husband's will, and the person that attended to what little business she had to do outside of her house and farm.   He gives us a detailed statement of the conversation he had with her about the proposed sale ; the danger of her living alone exposed to tramps and thieves ; what time would be best suited for the vendue, and the particulars of the whole arrangement, including her intended place of boarding.   And in all this business he tells us he acted strictly in accordance with her directions, and did not so much as volunteer his advice.   As he says, "the sale was conducted just as she wanted it, as near as William Nichols, John Anderson and I could do it."   In this, as in every other business which this witness speaks of transacting with and for her, it is obvious he was under the impression

[Caldwell *v.* Anderson.]

that he was dealing with a woman not only of sound mind, but also with one who was disposed to have her own way. Moreover, this man was at her house, not only on Wednesday, Thursday and Friday of the week of the sale, but also on the Monday and Wednesday of the succeeding week, the week of her death, and yet he nowhere intimates that his aunt exhibited any signs of mental aberration. With a case no better than this on the part of the contestants, there was really nothing for the proponents to rebut. They had, in the first place, proved the perfect mental capacity of the old lady to understand and conduct her own affairs; her complete and accurate knowledge of the amount and value of her estate, personal and real. Of the former she had been fully advised by Mr. Beatty, and again of both by Anderson and Nichols immediately before the execution of her will, and the making of that will was her own suggestion, having, as she said, been advised so to do by her husband before his death. Anderson and Nichols volunteered their advice in nothing, except that the former asked her, during the writing of the will, if she could not give Mrs. Caldwell more than the legacy of $400, proposed by the testatrix, and to this her prompt answer was a negative, saying she had enough. In fact, both Anderson and Nichols appear to have been but instruments of her own choosing, used for the purpose of taking her instructions from her lips, and putting them upon paper.

The rebutting evidence but confirms that which was given in chief. The testimony of the attendant physician, a nephew of the testatrix, and of the nurse, Mrs. Baldridge, a niece, are especially clear and important. We need repeat it only so far as it reveals the facts, that her disease commenced in a cold, and finally ran into capillary bronchitis, and that her mind was always clear and collected, except some flightiness during the night, or when she was in a state between sleeping and waking.

It being thus evident that the very first principle, on which rest the cases cited, being here wholly wanting, we might well stop and avoid further comment. But we do not think it proper to pass over in entire silence the fact, that William Anderson, who acted as scribe in drawing the will, was not a stranger to the blood of Mrs. Furry, but her own brother; one who, had she died intestate, would have been entitled to a large portion of her estate, and one whom it was to be presumed she would remember in her will. There is, then, no presumption against Anderson as there would be against a stranger, and the question is, after all, one of mere preference. Whatever of influence there was in his favor arose from his relationship to the deceased, hence of a character lawful and right. Moreover, he did not, by any means, receive the largest share of his

[Hughes v. Westmoreland Coal Co.]

sister's estate, for the bequests to her sister, Mrs. Nichols, and her children, were considerably in advance of the bequest to him.   So, as we have said, the matter is one of mere preference by the testatrix among her relatives, and that she should have preferred her brother and sister to other relatives does not seem to us so out of the ordinary course of things as of itself to raise a suspicion as to the rectitude of the transaction.   The law is not so utterly illogical and unnatural as to regard with disfavor the presence of a brother with his aged and childless sister at the time of the making of her will, though he may act as her scribe, and though he may become, what might reasonably be expected, one of her legatees.   On the whole, we are inclined to the opinion that the court below might, without answering any of the points, have instructed the jury to find for the plaintiffs.

The judgment is affirmed.