## Llewellyn's Estate.

Argued January 15, 1929. Before MOSCHZISKER, C. J., WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*James Gay Gordon,* with him *John R. K. Scott* and *William T. Connor,* for appellant.—A confidential relation existed between the decedent and Henry C. Swartley, the proponent of the will: Stepp v. Frampton, 179 Pa. 284; Scattergood v. Kirk, 192 Pa. 263; Worrall's App., 110 Pa. 349; Greenfield's Est., 14 Pa. 489; Sumby v. Green, 244 Pa. 151; O'Donnell v. Breck, 7 Pa. Superior Ct. 24; Phillips's Est., 244 Pa. 35; Douglass's Est., 162 Pa. 567; Messner v. Elliott, 184 Pa. 41.

Assuming that a confidential relation existed between Mr. Llewellyn and Mr. Swartley, an issue devisavit vel non should have been awarded, under all the evidence in the case: Greenfield's Est., 14 Pa. 489; Matthaei v. Pownall, 235 Pa. 460; Boyd v. Boyd, 66 Pa. 283; Adam's Est., 220 Pa. 531, 533-5; Yorke's Est., 185 Pa. 61, 69; Douglass's Est., 162 Pa. 567; Messner v. Elliott, 184 Pa. 41; Miskey's App., 107 Pa. 611; Yardley v. Cuthbertson, 108 Pa. 395; Wilson v. Mitchell, 101 Pa. 495; Stewart's Est., 137 Pa. 175; Cuthbertson's App., 97 Pa. 163; Scattergood v. Kirk, 192 Pa. 263; Corrigan v. Conway, 269 Pa. 373; Phillips's Est., 244 Pa. 35.

*Owen J. Roberts,* with him *Ralph B. Evans,* for appellee.—No confidential relation existed between decedent and Swartley as that relationship is defined in the law: Leedom v. Palmer, 274 Pa. 22; Messner v. Elliott, 184 Pa. 41; Douglass's Est., 162 Pa. 567; Herster v. Herster, 122 Pa. 239; Miller v. Oestrich, 157 Pa. 264.

Appellant cannot rely upon decedent's physical infirmity at the time the will was made: Harrison's App.,

100 Pa. 458; Wilson v. Mitchell, 101 Pa. 495; Yorke's Est., 185 Pa. 61; Caughey v. Bridenbaugh, 208 Pa. 414; Adam's Est., 220 Pa. 531; Phillips's Est., 244 Pa. 35; Barnard v. Kell, 271 Pa. 80.

Proponent's proofs were so strong that even conceding contestant made a prima facie case they left no substantial dispute which should go to a jury: Tetlow's Est., 269 Pa. 486; Guarantee Trust Co. v. Heidenreich, 290 Pa. 249; Caughey v. Bridenbaugh, 208 Pa. 414; Wolfe's Est., 284 Pa. 169; Yorke's Est., 185 Pa. 61; Miller's Est., 265 Pa. 315; McEnroe v. McEnroe, 201 Pa. 477; Morningstar v. R. R., 290 Pa. 14.

OPINION BY MR. JUSTICE WALLING, February 11, 1929:

William H. Llewellyn, of Philadelphia, founder of the Llewellyn Drug Store on Chestnut Street, died at his farm in Chester County on August 8, 1926, aged sixty-nine years, leaving first cousins as his heirs at law and next of kin. Soon thereafter there was duly probated what purported to be his last will, as follows, viz.:

"Llewellyn Farm Phœnixville, Pennsylvania.

"This is my will I give, devise and bequeath unto my friend Henry C. Swartley all my property, real personal and mixed whatsoever and wheresoever situate absolutely and in fee simple. Witness my hand and seal the ninth day of July 1926

"W. H. Llewelyn (Seal)

"Witness:

"Lillie Addington

"Edith K. Huyett R. N."

From this probate, cousins appealed to the orphans' court, praying for an issue to the court of common pleas on the questions of testamentary capacity and undue influence. The proponent (sole legatee) filed a responsive answer and testimony was taken. After a full investigation, the hearing judge filed an exhaustive opinion, finding, inter alia, that Llewellyn, the decedent, was of sound and disposing mind, that no undue influence was exerted

upon him by proponent or by any one in his behalf, re-
fusing an issue and decreeing that the appeal from the
probate of the will be dismissed. Exceptions filed there-
to on behalf of the cousins (contestants) were dismissed
by the court in banc and a final decree entered dismiss-
ing the appeal from the order of the register of wills ad-
mitting the above quoted will to probate. Therefrom
George T. Howard, a cousin and contestant, brought this
appeal.

The case involves approximately a million dollars, and
we have very fully considered every phase of it, both as
to the facts and the law, but find nothing to justify dis-
turbing the decree. Our duty in such case is stated by
the present Chief Justice, speaking for the court, in Tet-
low's Est., 269 Pa. 486, 495, viz.: "In view of the rele-
vant rules of law applicable to the particular case, is it
conceivable a judicial mind,—desiring only to arrive at
the truth and do exact justice,—could, on due consider-
ation of the evidence as a whole, reasonably have reached
the conclusion of the court below? When the answer to
this question is in the affirmative, the judgment appealed
from will not be disturbed."

Testamentary capacity is presumed, and in the instant
case was affirmatively established by the testimony of
five physicians and eight laymen, with no proof to the
contrary. In fact, this is frankly admitted by appellant's
counsel. The record is equally barren of any evidence
tending to show undue influence. In 1889, proponent,
then twenty-two years of age and learning the business
of an apothecary, was employed by decedent (ten years
his senior) as a clerk in his drug store at $9 per week
and two years later when receiving $12 a week the dece-
dent took a trip abroad, of some three months, and left
proponent in charge of the store. The result was so sat-
isfactory that his wages were raised and the same year
Llewellyn assisted him to purchase a drug store at
Market and Eighteenth Streets. This not proving very
satisfactory the decedent repurchased it from proponent

in 1892 and then sold him the Chestnut Street store for $65,000, taking his notes for all but $3,000 of the purchase price, which notes were all paid during the ensuing ten years. For some years the decedent lived at the Colonnade Hotel and the proponent occupied a room over the drug store at 1410 Chestnut Street; but about 1895, at the latter's invitation, the former joined him in the room last mentioned and for some seven years they occupied the same room, the same furniture and slept in the same bed. In 1901 proponent became engaged to marry, which the decedent approved, joined in their recreations and helped select a suitable home on Thirty-Fourth Street, where, after the marriage in 1902, to which he was the only witness, the couple began housekeeping. The decedent was an ever welcome guest at their home, in fact, took dinner there practically every evening when in the city, for twenty-four years. They went home to dinner together and so returned to the drug store, or if Swartley was not coming back in the evening he went to the car with Llewellyn. So far as practicable they were constant companions. In reality, the decedent was almost a member of the family, devotedly attached to Mr. and Mrs. Swartley, and also to their daughter born in 1903, who called him "Uncle Billy." Probably no two men, whether relatives or not, were ever more devoted friends than the decedent and proponent and this continued unbroken for over thirty-five years. They ate their luncheons, attended the theater and went on their vacations together.

The old Llewellyn homestead in Chester County had been purchased by the decedent at sheriff's sale and about 1914 he decided to make and did make it a show place. Beginning in 1916, he invited the Swartleys to make it their summer home, which they usually did. In pleasant weather he spent his days on the farm, but returned to his room over the drug store to sleep. Meantime, in 1912, the land at 1410 Chestnut Street had become so valuable that the drug store was moved to its

present location at 1518 Chestnut Street, over which the decedent occupied a room until his last sickness in 1926. For years Llewellyn and Swartley kept an automobile at their joint expense; otherwise there was no accounting between them. Llewellyn and his wife had separated before he knew Swartley. She later secured a divorce and then predeceased him. With Swartley and his family and in their home Llewellyn found his closest human ties. He was an active member of the Rotary Club and also of the Wanderers Club; was a man of excellent judgment, of strong will, of high ideals and intensely steadfast to the friendships he formed, which were not numerous.

In the late fall of 1925, Llewellyn's health began to decline. At first it was thought he had some gastric trouble, but as he continued to decline in weight and strength, a rest cure was prescribed. For that purpose in February, 1926, he took up his residence in Swartley's home on Thirty-Fourth Street, where he was put to bed in a large room, resembling a sun parlor. At the same time Swartley, who had sold the drug store in 1920 and was not in good health took a similar cure and for some weeks occupied another bed in the same room. Llewellyn, however, continued to decline and on May 24, 1926, was removed to the Hahnemann Hospital, where a thorough expert examination confirmed the suspicion of the attending physician that he had cancer of the liver and also of the rectum. He remained in the hospital until June 26th, during which time he was able to be up in a wheel chair and Swartley was with him more or less every day. On the last named day Llewellyn was taken in an ambulance to his farm in Chester County where on rare occasions he was able for some days to sit in a wheel chair.

Early in July, by skillful questions, he drew from the nurse the fact that he had cancer of the liver and would soon die. In view of this he asked Swartley, who, was living with him on the farm with his wife, to call up

Carlyle H. Ross, Esq., of the Philadelphia Bar, and ask him to come to the farm. This was done and Ross came the same afternoon and had a private interview with the decedent in which the latter expressed a desire to make a will, saying, in effect, that his nearest relatives were cousins, who meant nothing to him, and that he desired to give his property to Swartley, who was the only person he really cared for. Ross suggested creating a trust by which Swartley would have the income for life with remainder go to his heirs. Llewllyn expressed his disinclination to do anything which might show a distrust of Swartley or hurt his feelings. Ross also suggested that he might name the latter his executor and Llewellyn said he would talk the matters over with Swartley. Ross, saying he would return to the city and they might call up his office, bid Llewellyn good bye, and went down stairs, where Swartley asked him about recovering possession of the personal effects they had in the summer home, in the event of Llewellyn's death. Ross replied, "That will not become important as he is going to will you all his property." At this Swartley expressed surprise. Ross, securing from the latter, a piece of farm stationery, wrote thereon the will in question and left it saying it would be all right if that was what Llewellyn finally decided to do. The next morning the latter asked Swartley if Ross left any paper and the draft of the will being brought into the room sat up in bed and read it. Then, saying it would need witnesses, he asked Swartley to call in the nurse and the maid which was done and the will signed in their presence and witnessed by them. At the same time he signed and they witnessed a letter of attorney authorizing Swartley to sign and endorse checks, etc., at the Real Estate Trust Company. Swartley took charge of the papers and aside from his expression of gratitude to Llewellyn, and a discussion of how the latter desired to have the farm kept up, the matter was not again mentioned. The will was dated by the decedent and signed in his accustomed manner. In fact,

he continued to sign checks for two weeks after the execution of the will, and the letter of attorney had passed from the memory of the parties until recalled at the hearing of this contest. Llewellyn usually attended to his own business, but as he became physically weak, Swartley did some things for him, such as drawing checks and paying bills; also, during the latter weeks of his illness when decedent had become too weak to attend to his wants at night, Swartley slept in the same room and looked after him.

Previous to his last illness Llewellyn had expressed to Mr. Leidich, who succeeded Swartley as owner of the drug store, his intention of making a will and said he did not desire his property to go as it would under the intestate laws. There was no ill feeling between the decedent and his cousins, but with one exception they were not in the habit of visiting him and there was little if anything in common between him and them. Hence, the will in favor of the best friend he ever had, and as devoted a friend as any one ever had, was not unnatural or to be condemned. While the gift was unusual, the life long intimate friendship was equally so, and it being a credit to both should not be held prejudicial to either. See Frew v. Clarke, 80 Pa. 170.

Appellant urges that there was a confidential relation here such as placed upon proponent the burden of proof. As to this, the hearing judge and orphans' court find there was no confidential relation. Furthermore, even in case of confidential relation, the burden of proof is placed upon the legatee only where he is instrumental in procuring the legacy. Here, Swartley did not draw the will or suggest that it be drawn or that he be made legatee. On the contrary, it was drawn by a lawyer he had never seen before and who was called at the decedent's request. In summoning the attorney and in handing the draft of the will to Llewellyn, Swartley acted merely as his messenger. The active part which gives rise to the presumption must go to the substance of the testamen-

tary act, not to some mere formal matter. In the absence of such procurement, no burden of proof rests on the legatee: Douglass's Est., 162 Pa. 567; Miller et al. v. Oestrich, 157 Pa. 264; Messner v. Elliott, 184 Pa. 41.

Moreover, assuming the will was executed under such circumstances as placed upon the legatee the burden of showing it was the free and voluntary act of the testator, that burden, as the hearing judge and orphans' court find, was fully met. It is clearly shown without contradiction that the decedent, although weak in body, was in the full and perfect possession of his mind, that the will was his suggestion and drawn by his attorney to carry out his wishes and that proponent had no important part in its preparation. In such case it would be vain to grant an issue as a verdict setting aside the will could not be sustained. As stated by Mr. Justice FRAZER, speaking for the court, in Wolfe's Est., 284 Pa. 169, 175: "The court below properly found under the evidence in this record that even though it should be held that the burden of proof had shifted to proponent, he fully met the same by testimony which the court below characterized as so strong and convincing that it left no dispute, much less a substantial dispute, as required to justify the awarding of an issue."

It may also be added that it is only where the testator is of weak mind, arising from physical or mental ailment that a presumption of undue influence arises when a stranger to his blood procures a large legacy: Adam's Est., 220 Pa. 531; Caughey v. Bridenbaugh, 208 Pa. 414; Robinson v. Robinson, 203 Pa. 400; Friend's Est., 198 Pa. 363, 366; Herster v. Herster, 122 Pa. 239; Caldwell v. Anderson, 104 Pa. 199, 204. To place the burden of proof on proponent, there must be evidence of weakened intellect: Phillips's Est., 244 Pa. 35, 44; Gongaware et al. v. Donehoo et al., 255 Pa. 502, 508. In the instant case, the physical weakness apparently had no effect upon his mental faculties. As late as July 21, 1926, the decedent overruled Swartley as to the manner of pay-

ment of a large farm bill. We might well adopt here the language of Chief Justice FELL, speaking for the court, in Eble v. Fidelity T. & Tr. Co. et al., 238 Pa. 585, 589: "Undue influence to affect a will must be such as subjugates the mind of the testator to the will of the person operating upon it: Tawney v. Long, 76 Pa. 106. Where the charge is that undue influence has been exerted on a strong and free mind, nothing short of direct, clear and convincing proof of fraud or coercion will avail: Logan's Est., 195 Pa. 282. The only reasonable conclusion from all the testimony is that the will in question was the deliberate act, after mature reflection, of a mind wholly unconstrained." Or, as stated by Mr. Justice DEAN, speaking for the court, in McEnroe v. McEnroe, 201 Pa. 477, 482: "Here, one of the most significant facts tending to show undue influence is wholly absent; there was no impairment of the mental powers, no clouding of intelligence." And see Miller's Est., 265 Pa. 315, 319; Phillips's Est., supra; Yorke's Est., 185 Pa. 61, 70; Cuthbertson's App., 97 Pa. 163, 171.

The decree is affirmed and the appeal is dismissed at the cost of appellant.