Argued May 12; reversed July 6, 1938

## McFARLAND *v.* ELLINGSWORTH ET UX.
### (80 P. (2d) 899)

Department 2.

B. A. *Green*, of Portland (Green, Tanner & Boesen and Clarence H. Gilbert, all of Portland, and Roy R. Hewitt, of Salem, on the brief), for appellant.

*Guy O. Smith,* of Salem (E. K. Piasecki, of Salem, on the brief), for respondent.

ROSSMAN, J.   This is an appeal by W. H. Ellingsworth from a decree of the circuit court which cancels a deed signed by Lola C. Ownbey March 20, 1933, and which bears his name as grantee.   Mrs. Ownbey died intestate December 1, 1936, aged 73 years.   The plaintiff, John L. McFarland, is the administrator of her estate.   The defendants are Ellingsworth and his wife Cora.   The complaint charges that at the time of the execution of the deed Mrs. Ownbey

"was a person wholly inexperienced in business and financial affairs and was frail and infirm in body and mind and was easily influenced and persuaded by those in whom she had confidence or for whom she had respect, * * * For many years during the life of Lola C. Ownbey she was intimately and personally acquainted with the defendant Cora Ellingsworth, and for some years past she was personally acquainted with the defendant W. H. Ellingsworth, and during said acquaintance the said Lola C. Ownbey held said defendants in high esteem and considered and regarded them among, if not her most intimate friends and acquaintances, and reposed confidence in them to assist and aid her in the management of her business and property interests, and considered and believed that said defendants would at all times deal honestly and fairly with her concerning said matters and would advise and assist her concerning her business and financial matters for her own interest, advantage and benefit, and would not, under any circumstances, take advantage of her inexperience, infirmities or sickness * * * On or about the 20th day of March, 1933, the defendants solicited and importuned the said Lola C. Ownbey to convey to the defendant, W. H. Ellingsworth, the real property hereinabove described, and on about the 1st day of May, 1936, the said defendants persuaded and prevailed upon the said Lola C. Ownbey

to pay over to them the sum of Twelve Hundred ($1,-200.00) Dollars, the personal property of the said Lola C. Ownbey and in order to secure unto the said defendants the real and personal property as above mentioned the said defendants claimed and represented to the said Lola C. Ownbey, now deceased, that it would be to her individual interest and benefit to transfer and deliver to the said defendants the said property, and that they would take and hold said property for the benefit and advantage of the said Lola C. Ownbey * * *. The inducement and reason for the transfer and delivery of the property as hereinabove set forth was not for the purpose of aiding and assisting the said Lola C. Ownbey, now deceased, in the management and handling of her business and financial interests and property but was for the purpose and with the intent of robbing, cheating and defrauding the said Lola C. Ownbey of her property * * *"

The prayer seeks a cancellation of the deed and demands judgment for $1,200.

Briefly stated, the facts are that as the result of toil upon farms and the practice of thrift, J. E. Ownbey and his wife, the aforementioned Lola, acquired 160 acres of farm land in Linn county, 23 acres in Marion county near the city of Salem, and a few minor items. Their home was upon the 23-acre tract. In January of 1931 Ownbey died testate, devising all of this property to his relatives. The Ownbeys had no children. Mrs. Ownbey, who was then 67 years of age, believed that this disposition of the property which she had helped to accumulate was very unjust and grieved over the fact that she had been thus treated in her deceased husband's will. While many of the witnesses described her distress of mind, none of them expressed a belief that her feelings were unjustified; to the contrary, all appeared to sympathize with her.

This disposition of the estate left Mrs. Ownbey with a life estate in one-half part of the two farms (§ 10-301, Oregon Code 1930). However, since the 23 acres near Salem had been the Ownbeys' home, an order was entered, pursuant to the provisions of §§ 3-205 and 11-402, Oregon Code 1930, setting aside to the widow six of the 23 acres as her property. The six acres included the dwelling house. No reliable evidence is in the record concerning the value of this homestead at the time of the challenged deed's execution, but the testimony upon this point, such as it is, seems to indicate a value of possibly $4,000. Thus, the widow now owned the six-acre tract and a life estate in one-half of the rest of the 23 acres, as well as a similar estate in one-half of the 160 acres in Linn county. Besides these properties she owned another tract of 50 acres which she had inherited from her father and which one Loren Luper had contracted to purchase at a price of $2,500. She also had $4,000 cash.

About six years after the death of Ownbey, that is, on December 1, 1936, Mrs. Ownbey died. Three years, eight months and twelve days prior to her death she executed the deed in question. By it she conveyed the aforementioned six-acre homestead to the defendant-appellant.

Mrs. Ellingsworth, who had known Mrs. Ownbey for 46 years, testified: "I knew her before I started to school. * * * From the very first time I saw Mrs. Ownbey when she came to call on my mother, she called me her girl, from that time to the day she passed away, I think I was practically her girl. She always called me that. I looked to her as to my mother and I think I loved her—not as much as an own mother, naturally, but I know she loved me like I was her daughter."

Ellingsworth knew Mrs. Ownbey for 33 years, the acquaintanceship having begun about the time of his marriage. We deem it unnecessary to review herein the evidence which shows the friendship which existed between the Ellingsworths and the Ownbeys because the part of the complaint, quoted in a preceding paragraph, concedes it; at least, the friendship between the Ellingsworths and Mrs. Ownbey. The same friendly feeling was manifested between the Ellingsworths and Mr. Ownbey prior to his death.

After Ownbey's death Mrs. Ownbey felt very lonely and at times when she was alone was given to spells of crying. Dr. O. H. Kent, an osteopathic physician, whom Mrs. Ownbey had consulted in the last years of her life, described her thus: "She was very anemic, high blood pressure and subject to spells of melancholia." The immediate cause of her death, according to one of the plaintiff's witnesses, was "a heart attack" following two weeks of pneumonia.

Mrs. Ownbey was, apparently, a friendly soul and liked to have people around, especially when they stayed in her home for periods of time. More than one of the witnesses described her as a jovial companion. Besides the relatives who lived in Marion and Linn counties, she had a large circle of friends for whom she manifested fondness. According to some of the evidence, she complained of her relatives, expressing a feeling that they neglected her. Possibly, she expected too much. Her feeling may have been somewhat influenced by a conviction that, through her deceased husband's will, the relatives possessed property which she had helped to earn and which she, rather than they, ought to be enjoying. It also seems that her feeling towards at least three of her relatives was rendered less

cordial by the fact that they were her debtors in substantial sums of money and were meeting their obligations to her in an unsatisfactory manner. One of these three was Loren Luper, an adopted brother, who owed her $2,000 upon the purchase price ($2,500) of the aforementioned 50-acre tract which he had contracted to buy. The other two relatives were John L. McFarland, a nephew, and Rova Conn, a niece. These two owed her at the time of her death a balance of $1,150 upon an unsecured loan of $1,400. One of the witnesses, who was not a relative, testified: "She frequently worried about money she couldn't get in, she spoke of that to me * * * she couldn't get in some money she had coming to her, she felt she would be all right if she could get that in." One of the plaintiff's witnesses (Dr. Kent) testified: "Once after I had sent her a statement she came in and said she didn't have any money because she had loaned so much, she said she had loaned her money and couldn't get it back."

While Mrs. Ownbey spent money upon herself with a stinting hand, she was generous with others. She gave to her neighbors fruit, flowers and surplus milk from her cow. For Ralph Darling, a twenty-year-old boy in whom she displayed an interest, she gave some items of furniture and made for him a quilt. Good will was manifested to others in various ways.

Her fondness for friendships and company, which could not be satisfied by her relatives alone under the circumstances which existed, caused Mrs. Ownbey to reach out into other quarters. Four years before her death she took into her home the aforementioned young man, Ralph Darling, and displayed towards him the affection of a mother for her son. She gave him two automobiles and before her death gave to him many of

her personal belongings. The two of them took many trips of considerable length in the cars. He worked at an airport and gave Mrs. Ownbey the new experience of an airplane ride. Upon another occasion after Ralph had found some employment in California Mrs. Ownbey made a visit to that state which lasted for about six months during the course of which Ralph and his sister contributed much to her pleasure. The friendship of Mrs. Ownbey for Ralph terminated only with her death.

Just as Mrs. Ownbey resorted to Ralph as a means of satisfying her craving for company, she invited the Ellingsworths to pay her a visit. In October of 1933 they arrived at her home and Mrs. Ellingsworth remained there until June of 1934. Ellingsworth was a traveling salesman and visited the home only intermittently in this period of time, but Mrs. Ellingsworth stayed with Mrs. Ownbey continuously during the visit. She helped with the housework and in other ways rendered herself agreeable. She and her husband provided much of the food and this was very acceptable to Mrs. Ownbey who spent money upon herself reluctantly. In addition to this visit of several months, the Ellingsworth paid her other visits of shorter duration. They frequently took her upon automobile trips. Several were made to the home of Mrs. Ellingsworth's parents with whom Mrs. Ownbey was acquainted. One of several days' length was taken to Southern Oregon and Northern California; another to the eastern part of this state, and a third took them into the state of Washington. Upon these trips the Ellingsworths paid all of the expenses of gasoline, meals, rooms, etc., which circumstance Mrs. Ownbey, according to the Ellingsworths, contrasted with the fact that her relatives

always expected her to pay for the expenses of trips upon which they took her. Apparently nothing occurred during these trips and visits which lessened the harmonious relationship between the Ellingsworths and Mrs. Ownbey; quite to the contrary, the friendship was further cemented.

It will be observed that the questioned deed was executed in March of 1933, about seven months before the visit which began in October of that year. Mrs. Ownbey's six-months visit to California did not occur until the latter part of 1934. Ellingsworth testified that he knew nothing whatever concerning Mrs. Ownbey's intention to give him the deed. He expressed his surprise thus: "It all came out of a blue sky." He swore that on March 20, 1933, when he and his wife were visiting Mrs. Ownbey she asked him to drive her to the Ladd & Bush Bank in Salem, and that he accommodated her by doing so. Upon reaching the bank both entered, but Mrs. Ownbey retired to one of the departments while he busied himself at another window. In a few moments she came to Ellingsworth, handed him a document and, according to him, "she simply said she wanted to give me the deed for what I had done for her, and I had been kind to her.   *   *   *   I asked her what it was and she said, 'I will talk to you about it later.'" Ellingsworth swore that he observed that it was a deed and was greatly surprised at the gift. He could think of nothing to do but thank her. Upon returning to the Ownbey home Mrs. Ownbey, according to Ellingsworth, told him that she wanted him to have the place but that she desired to stay upon the property as long as she lived. He claimed that thereupon they orally effected an arrangement of that kind. The consideration mentioned in the deed is "Ten

($10.00) Dollars and other valuable consideration.": According to Ellingsworth, Mrs. Ownbey said, "'Well, now this deed says ten dollars and other considerations. Now, I understand what the other valuable considerations is, but it says ten dollars, and' she says, 'I think you should pay me ten dollars for it.' I says, 'That is perfectly all right,' and handed her ten dollars." Mrs. Ellingsworth testified that when her husband and Mrs. Ownbey returned home "she (Mrs. Ownbey) just said, 'The deed calls for ten dollars,' and she says, 'I wish you to give that to me, I think you should, because I want it to be all legal.'" The Ellingsworths swore that they had had absolutely nothing to do with the gift of the deed nor with its preparation. He testified that about the time when Mrs. Ownbey gave him the deed she said, referring to the relatives, "'They have got all I want them to have, and I don't want them to have any more.' * * * She said, 'I don't want them to have anything, they have had enough, and I don't want them to have anything more. They never come to see me, and have nothing to do with me and you folks have been better than my relatives, and they have got their share and more too, and I want you to have it.'" Mrs. Ellingsworth testified to similar effect. Referring to Mrs. Ownbey and her attitude towards her relatives, she swore, "She just said, 'The rest have got all they are going to get, I want you to have something.' * * * Well, she just made the remark, 'You are no more like my own people than anything, you always help me with everything.'" One of the neighbors, after testifying that Mrs. Ownbey felt embittered over the manner in which the jointly accumulated property "was willed away from her", was questioned, and answered as follows:

"Q. Did she (Mrs. Ownbey) express the opinion that her relatives had received enough? A. She said they had enough.

"Q. Did she say anything about the disposition of this property? A. The six acres?

"Q. Yes. A. She said she had it fixed so that they wouldn't get any more."

Ralph Darling, in an affidavit which referred to Mrs. Ownbey, stated:

"On various and sundry occasions she told me that her relatives had had enough of her husband's and her property and that she did not wish them to have more.

"Prior to her death she intended to and did make disposition of certain parts and articles of her property."

Ellingsworth held the deed for about eight months before he recorded it, placing it of record December 2, 1933. He swore that in the meantime Mrs. Ownbey inquired of him many times, "Have you put it on record?" and urged him to do so, stating, "I want to know it is yours before I die." He swore that after the receipt of the deed he paid the taxes upon the property for four years, gave the house a new coat of paint and in other ways helped to take care of the property.

The fact that the conveyance had been made was well known in the neighborhood and by Mrs. Ownbey's relatives. A deputy county assessor told Mrs. Ownbey's brother-in-law about the deed. He thereupon went to the courthouse and read the recorded instrument. A neighbor at the time of a school election discovered that Mrs. Ownbey no longer owned the property. Shortly all of the relatives and neighbors knew about the matter. Loren Luper, the brother of Mrs. Ownbey, inquired of her about the conveyance, and, according to his testimony, received the following reply: "Ask me no questions and I'll tell you no lies." He added that after

this answer she (Mrs. Ownbey) "kind of laughed and that was just the words she said."

The subscribing witnesses to the deed are Jacob Fuhrer and Roy Burton, two of the officials of the Ladd & Bush Bank. The former, a notary public, attached his notarial certificate to the instrument manifesting Mrs. Ownbey's execution of it. The defendants produced the deed during the course of the trial and it became one of the exhibits.

Dr. Kent, as a witness for the plaintiff, swore that Mrs. Ownbey told him that she had "deeded her place where she lived to a friend and she could get it back any time she wanted to". Mr. Luper, also a witness for the plaintiff, testified that Mrs. Ownbey said to him, "I can get it back any time I want it." Based upon this testimony, the plaintiff argues that Mrs. Ownbey did not understand what she had done. Nevertheless, according to both witnesses, she used the word "deed", and when Luper inquired of her, "Why did you do that?" he received the reply previously quoted, "Ask me no questions and I'll tell you no lies." Luper did not claim that Mrs. Ownbey failed to understand the nature of the transaction, and, as we have seen from other witnesses, she repeatedly stated that she was so arranging matters that her relatives would receive nothing from her estate. Two relatives, as witnesses for the plaintiff, swore that Mrs. Ownbey offered to reward them well if they would make their home with her. The circumstances, we believe, indicate that she understood what she had done.

The record contains no intimation whatever that Mrs. Ownbey ever regretted the conveyance of the property. Six months after delivering the deed, as we have already seen, she invited the Ellingsworths to

make the extended visit in her home which is described in a preceding paragraph. They left in June of 1934 and five months later Mrs. Ownbey visited friends and relatives in California for about six months. During this period she was completely away from the Ellingsworths, but wrote to them many letters couched in terms of friendship. The salutation in these letters was "Dear Bill and Cora", and the complimentary close was "Lots and heaps of love," "With best love to both," "Your pal," etc. Upon her return home, life resumed its ordinary course. Friends and relatives called. Trips by automobile were taken, including a lengthy one to British Columbia with Ralph as driver. In the meantime, Luper made his inquiry of his sister concerning this conveyance and received the reply previously quoted, which clearly indicated satisfaction with the conveyance. If any intimation came from her indicating dissatisfaction with what she had done, no witness mentioned it. And we add that the plaintiff called 15 witnesses, all but two of whom were relatives. The defendants called 19.

The conveyance was not without its advantages for Mrs. Ownbey. It relieved her from payment of taxes, and when the house needed repainting Ellingsworth defrayed the expense. In the meantime, she continued to reside upon the property and was there when her last sickness overtook her.

On May 1, 1936, Mrs. Ownbey handed Ellingsworth a check for $1,200, payable to him, drawn upon the Ladd & Bush Bank. We now quote from his testimony: "She gave me the check in Ladd & Bush Bank, she handed it to me and said, 'Now I gave you the place and I want you to put this in the bank for Cora,' she says, 'Of course, I know you have a joint account, but just

the same I want her to know this is hers.' " He swore positively that he had received no intimation whatever that the gift was to be made and disclaimed any thought that anything whatever was due either him or his wife from Mrs. Ownbey for which the check could constitute payment. At that time the Ellingsworths were living in Portland where Mrs. Ellingsworth was temporarily employed. Ellingsworth deposited the check and told his wife about it upon his next trip to Portland. Mrs. Ellingsworth testified that she shortly came to Salem, called upon Mrs. Ownbey and thanked her. Referring to her expressions of appreciation, she swore: "I couldn't repeat it word for word. I thanked her for it, and told her I sure appreciated it. Then she said it wasn't no more than I deserved for being her girl all these long years and putting up with her. She said, 'Nobody writes to me and I feel like nobody cared until you come out and you soon have me joking and laughing again.' " Upon cross-examination, she testified, "Well, I thanked her. That is all I could say, what could anyone say?"

"Q. Thanked her for the money? A. And told her I appreciated it, but what I had done for her I didn't do for money.

"Q. And she said, 'That is all right, I want you to have it'?

"A. Yes."

Mrs. Ori Ewell, a cousin of Mrs. Ownbey, as a witness for the plaintiff, testified that in May, 1936, Mrs. Ownbey returned to her home with Mr. Ellingsworth after the latter had taken her upon an automobile trip, and that then the following occurred: "He came in and sat down and she seemed to be all excited and her eyes looked wild, and she went to the drawer where

she kept her checkbook and papers and opened it and got out her checkbook and went in the bedroom and wrote a check and they went outside, of course I didn't know what amount it was, but she had the check in her hand when she came out of the bedroom.''

"Q. Do you remember when that was? A. I don't remember just the date, it was about the time the taxes were due, some time the first of May last year.''

We do not know what purpose the plaintiff had in mind when he offered this evidence unless it was to dispute the defendants' account of the origin of the $1,200 check and to make it appear that Ellingsworth got the check through improper means. It will be observed, however, that this testimony does not disclose the denomination of the check nor indicate that it was handed to Ellingsworth. No other witness was questioned concerning this purported incident. The decree of the circuit court recognized as valid the gift of the $1,200.

Many of the plaintiff's witnesses testified that Mrs. Ownbey was easily influenced. Some thought that she was a little odd. One said that she believed anything that people told her. Others thought that her business experience had been very meager and that she lacked the ability to attend to her own affairs. The following is the impression of one of the witnesses: ''Anybody could influence her on most any subject.'' Another testified: ''She was very easily influenced. If anybody would treat her nice she would be good to them, she was that type, anybody could get along with her provided they showed her affection.  *  *  *'' The plaintiff described Mrs. Ownbey thus: ''She was possessed of abnormal credulity.  *  *  *  Just a victim of anybody she had confidence in, a very easy victim of a con-

fidence man. I don't think there is a person in the world but who could have done exactly the same as these defendants have done—an abnormal display of friendship and affection and, why, if you had her confidence you could swing her any way   *   *   *.'' However, we observe that the plaintiff and his sister were indebted to Mrs. Ownbey and, according to the testimony of more than one of the witnesses, Mrs. Ownbey, after endeavoring to hasten the slow payments, expressed keen disappointment with the results. It will also be recalled that Luper, who likewise gave an adverse opinion concerning Mrs. Ownbey's will power, was indebted to her upon an overdue account. The witnesses who thought that Mrs. Ownbey lacked firmness and will power mentioned no incidents whatever except the facts that she bought a vacuum cleaner when she already possessed a good one, and changed her faith from that of a Methodist to a Seventh Day Adventist. For both incidents there are explanations in the record. J. C. Galbraith, another of the plaintiff's witnesses, swore that Mrs. Ownbey had ''never had very much'' business experience and that ''she depended a good deal on other people'' for advice. Nevertheless, he admitted that preceding the national banking holiday, as a result of which hundreds of institutions failed to reopen, Mrs. Ownbey sought his help in transferring her account of $4,000 from an institution, which subsequently failed to reopen after the holiday, to the Ladd & Bush Bank. Many other witnesses, who were wholly disinterested, expressed favorable opinions concerning Mrs. Ownbey's mental capacity and her ability to handle her own affairs. They admitted that she freely sought advice, but swore that she rejected the part which she deemed unsound and arrived at independent conclusions. From the fact that she somehow foresaw the approaching banking

disasters and then displayed the good judgment to take her funds out of an institution which was in a precarious condition and place it in another of proven strength is a strong indication that she had the capacity to attend to her own affairs. Upon her death she had $600 in cash, $3,150 due her upon the accounts previously mentioned and sufficient personal property that $291 was derived from it upon sale. She had accomplished this notwithstanding the fact that her husband's will had virtually disinherited her. She had handled the Marion county property with such good judgment that she had retained the ownership of six acres of it which constituted her home. Moreover, she had accumulated "friends, those relations that one makes for one's self".

There is no evidence in the record indicating that the Ellingsworths were peculiarly the confidential advisers of Mrs. Ownbey. From time to time she asked their advice, but she did the same with others. Only one incident disclosed by the record indicates that she particularly depended upon the Ellingsworths. Ellingsworth testified that upon one occasion she withdrew $1,750 from her bank account and delivered it to him. He deposited this sum in his own name in the postal savings department of the Salem post office. He gave the following explanation of this incident: "She said there were people who had money borrowed of her that was coming there wanting to borrow more money and she didn't like to lie about it and tell them she didn't have any money, and she turned it over to me for safekeeping so she could honestly and correctly tell them she was broke." Ellingsworth declared that from time to time he paid her out of this account the sums which she requested and that in about two years returned to her the unexpended balance.

The above, we believe, is a fair summary of the evidence. Some details have necessarily been omitted, but have not been overlooked.

It will be observed that the parties have apparently placed all of the evidence before the court. If they neglected any item no intimation to that effect appears in the record nor in the briefs. Although the plaintiff insists that the circumstances placed the burden of proof upon the defendants, he does not contend that the burden has not been discharged. His brief nowhere states that the defendants failed to come forth with the proof of any essential fact. The plaintiff's argument that the burden of proof rested upon the defendants is predicated upon a contention that a confidential relationship existed between the Ellingsworths and Mrs. Ownbey and that, hence, they were required to disclose all of the circumstances of the gifts.

We believe that the Ellingsworths possessed the respect, friendship and confidence of Mrs. Ownbey; if they had not possessed her good will, certainly, the gifts would not have been made. But, as will readily be seen from the above review of the evidence, others also possessed her confidence. To one she sold 50 acres of land in Linn county, receiving only a small down payment; to two others she loaned $1,400 upon an unsecured note; to Ralph she made very valuable presents; from Dr. Kent she sought advice concerning business matters; to another she resorted for help in transferring a $4,000 bank account; and to still others she turned for assistance in various matters. But the record contains no evidence whatever that the Ellingsworths in any way requested the gifts or suggested to her that the gifts should be made. They testified that the gifts were purely voluntary; certainly, there is no direct evidence which indicates the contrary, and the plaintiff has

called to our attention no indirect evidence to that effect.

■ In the carefully prepared decision entitled *Estate of Wm. H. Llewellyn*, 296 Pa. 74 (145 Atl. 810, 66 A. L. R. 222), which we have cited with approval in *In re Rupert's Estate*, 152 Or. 649 (54 P. (2d) 274), and *In. re Knutson's Will*, 149 Or. 467 (41 P. (2d) 793), the court declared that a confidential relationship places the burden of proof upon the recipient of a gift (there a legacy) only when he was instrumental in procuring it. We agree with that view of the law. Since the Ellingsworths had not inspired these gifts, it seems reasonable to infer they had no better means of accounting for the circumstances than the plaintiff. Nevertheless, it is natural to scrutinize the record carefully in all instances of this kind, and we have done so. We repeat, however, that the plaintiff mentions no missing item and does not contend that the defendants failed to come forth with proof of something which would clarify the issues.

Although we have read the transcript of evidence and the exhibits with care, we have found nothing which indicates that the Ellingsworths employed any deceit or importunities in gaining these gifts. No one contends that they endeavored to misrepresent her relatives to Mrs. Ownbey. They made no efforts whatever to keep the relatives from the home. Although the appellants' brief contains the statement, which we shall now quote, the respondent made no effort whatever to challenge the verity of that statement nor to indicate that the gift of the deed resulted from any improper conduct:

"Likewise there is no evidence whatsoever that the defendants or either of them 'solicited and importuned' or that they or either of them 'persuaded and prevailed'

upon Mrs. Ownbey to make either of said transfers, or that they or either of them represented to her that it would be to her advantage to make either of said transfers; and there is a total lack of evidence to prove any of the wrongful acts with which the defendants are charged in the Complaint.''

We are impressed with the fact that the Ellingsworths in their testimony did not attempt to buttress the $1,200 check with a contention that it constituted payment for services or some other form of debt. Likewise, they seek to sustain the deed purely as a gift.

■ The argument that Mrs. Ownbey lacked mental capacity, in our opinion, lacks substantial support; in fact, it is so ill founded that it reflects adversely upon the entire claim. We believe that she handled the slender estate obtained from her husband with remarkably good judgment. The transfer of her account from a weak bank to a strong one, apparently upon her own volition, indicates sagacity.

■ The mere fact that one makes a gift to a friend affords no occasion for invoking adverse presumptions. It is not difficult to account for these gifts. Anyone who sees his relatives accept property which he himself helped to accumulate is bound to view the situation and the relatives with at least some disfavor. Upon the other hand, the ties of friendship occasionally make claims upon the heart stronger than those of distant relationships. This elderly woman, as she was approaching the end of the journey, frequently expressed the conviction that her relatives had received enough of the fruits of her toil, and that she now desired to reward her faithful friends.

> ''Should auld acquaintance be forgot
> And never brought to mind—'' ·

It is our belief that the circuit court erred when it decreed a cancellation of the aforementioned deed. That portion of the decree will be reversed. All other parts of it are affirmed. Costs and disbursements will be allowed to neither party.

BEAN, C. J., and BAILEY and LUSK, JJ., concur.